**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. ANTHONY GADSON, AKA Anthony Gadsen, *Defendant-Appellant*. | No. 12-30007 D.C. No. 4:11-cr-00010-RRB-4 |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. WILLIE WILSON, *Defendant-Appellant*. | No. 12-30047 D.C. No. 4:11-cr-00010-RRB-2 OPINION |

Appeal from the United States District Court
for the District of Alaska
Ralph R. Beistline, Chief District Judge, Presiding

Argued and Submitted
August 13, 2013—Anchorage, Alaska

Filed August 19, 2014

Before: Alex Kozinski, Chief Judge, and Marsha S. Berzon
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Concurrence and Dissent by Judge Berzon

## SUMMARY[*]

### Criminal Law

The panel affirmed (1) Anthony Gadson's conviction and sentence for conspiracy to distribute more than 500 grams of cocaine, possession with intent to distribute controlled substances, possession of firearms in furtherance of the conspiracy, and possession of controlled substances; and (2) Willie Wilson's conviction and sentence for the same offenses as well as for retaliation against a witness.

The panel held that the district court did not misinterpret the hearsay rules and did not abuse its discretion in declining to admit, as statements against interest under Fed. R. Evid. 804(b)(3), out-of-court statements by Gadson's brother. The panel held that the exclusion of the statements did not deprive Gadson of his constitutional right to present a defense.

The panel held that the district court did not abuse its discretion in admitting the government's dog sniff expert testimony without holding a *Daubert* hearing, where there was adequate evidence regarding the reliability of the dog's alert.

The panel held that the district court did not plainly err by failing to raise sua sponte the question of the authenticity of the recordings of prison phone calls made by Gadson and Wilson to third parties, and that the district court did not abuse its discretion in concluding that the government had

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

carried its burden of making a prima facie case that the voices on the tapes were those of Gadson and Wilson.

The panel rejected Wilson's multiple arguments regarding the district court's admission of an officer's testimony regarding the recorded phone calls. The panel held that the district court did not plainly err in not considering sua sponte whether sufficient steps were taken to ensure the statements' accuracy, and that Wilson did not establish that the district court plainly erred in admitting the tapes on audibility grounds. The panel rejected Wilson's contention that the district court erred in allowing the officer to testify concerning the content of the telephone calls. Applying Fed. R. Evid. 701, the panel observed that a lay witness's opinion testimony necessarily draws on the witness's own understanding, including a wealth of personal information, experience, and education, that cannot be placed before the jury.

The panel held that the district court did not err in declining to strike a portion of the officer's testimony as impermissible vouching, or as an improper opinion on the ultimate issue of guilt or innocence under Fed. R. Evid. 704(b). The panel wrote that there is no basis for applying Rule 704(b) to a lay witness.

The panel held that the district court did not plainly err in formulating its jury instruction on *Pinkerton* liability, and that a rational jury could have concluded that it was reasonably foreseeable to Gadson that one of his co-conspirators would use a firearm in furtherance of the drug trafficking offenses.

Reviewing for plain error, the panel held that there was sufficient evidence to support Wilson's conviction under 18

U.S.C. § 1513(b)(2) for assaulting an informant with the intent to retaliate for providing information to the government.  The panel explained that unlike with confessions to the police, corroboration is not required for Wilson's private statements, intercepted by the police, made to his cousin.

The panel held that the district court did not commit reversible error at sentencing in calculating the quantity of drugs attributable to Gadson, in applying to Gadson a managerial role enhancement pursuant to U.S.S.G. § 3B1.1(b), or in denying Wilson a minor role reduction pursuant to U.S.S.G. § 3B1.2.

Judge Berzon concurred and dissented.  She concurred with the majority opinion except for the part concerning the officer's testimony as to the content of the defendants' recorded telephone conversations.  She wrote that *United States v. Freeman*, 498 F.3d 893 (9th Cir. 2007), upon which the majority's holdings rest, goes much too far in allowing lay officer testimony concerning recorded conversations, and should be revisited en banc.  Even accepting *Freeman* as binding precedent, she would hold the trial court plainly erred in admitting some of the officer's testimony and that the error was prejudicial.

**COUNSEL**

John Balazs, Sacramento, California, for Defendant-Appellant Anthony Gadson.

Krista Hart, Sacramento, California, for Defendant-Appellant Willie Wilson.

Kirby A. Heller (argued), Mythili Raman, Acting Assistant Attorney General, Denis J. McInerney, Acting Deputy Assistant Attorney General, Criminal Division, United States Department of Justice, Washington, D.C.; Karen L. Loeffler, United States Attorney, Elizabeth F. Crail, Special Assistant United States Attorney, Stephen Cooper, Assistant United States Attorney, Anchorage, Alaska, for Plaintiff-Appellee.

**OPINION**

IKUTA, Circuit Judge:

Anthony Gadson and Willie Wilson appeal their convictions for conspiracy to distribute more than 500 grams of cocaine, possession with intent to distribute controlled substances, and possession of firearms in furtherance of their conspiracy and possession of controlled substances. Wilson also appeals his conviction for retaliation against a witness. On appeal, they challenge various evidentiary rulings, the correctness of certain jury instructions, the sufficiency of the evidence as to two counts, and sentencing determinations. We affirm the convictions.

I

During the period from March 2009 through February 2010, a residence at 5260 Fouts Avenue in Fairbanks, Alaska, was the hub of a drug trafficking operation. Two brothers, Brandon and Joshua Haynes, along with Donte Edwards, lived at the Fouts house.[1] Gadson, a brother of Brandon and Joshua Haynes, visited the house from time to time, though he lived in Anchorage. Wilson, a cousin of the Haynes brothers and Gadson, joined the group in November 2009. Joe Powell was also involved with the group and would sometimes complete transactions on behalf of Brandon Haynes.

According to testimony at trial, Joshua Haynes regularly sold crack cocaine at or near the Fouts house. Joshua made ten sales of cocaine to Joshua Voaklander during the spring and summer of 2009, half of which were witnessed by Gadson. During one of the transactions at which Gadson was present, Joshua displayed an assault rifle hidden under his couch cushions to Voaklander, which Joshua said was "for when somebody comes in through the front door."

One of the sources for the cocaine was a person with the code name "Transporter" who brought drugs up from Anchorage to the Fouts house in Fairbanks. On the two occasions that Gadson's trips to the Fouts house coincided with Transporter's trips, Gadson picked up bags containing $40,000 to $50,000 in cash from Brandon Haynes. At one point, Transporter was arrested for driving without a license,

---

[1] We refer to Brandon and Joshua Haynes by their first names where necessary to avoid confusion.

and Gadson complained that his arrest could have "messed everything up," meaning "everybody go to jail."

Officer Avery Thompson, a member of the Alaska Statewide Drug Enforcement Unit, began investigating this drug conspiracy in early 2010. By February 2010, he suspected that the Fouts house was at the center of a drug operation. A confidential informant working with the investigation executed two controlled buys of cocaine from Edwards, one of which took place in the driveway of the Fouts house. Following the buy, Officer Thompson and other members of the Fairbanks police department obtained a search warrant for the Fouts house. Although no one was in the house at the time of the search, they saw footprints in the new snow leading away from the open kitchen window. Subsequent investigation revealed that these footprints belonged to Wilson, and that when the police arrived, Wilson escaped out the window in his bare feet and scrambled over to a friend's house.

Inside, Officer Thompson and the other police investigators found a shoe box on top of the living room couch containing approximately a kilogram of cocaine, another shoe box containing another kilogram of cocaine and some $29,000 in cash behind the drugs. Gadson's fingerprints were identified on the second living room shoe box. A loaded shotgun and ballistic vests were found near the shoe boxes. Powder cocaine, crack cocaine, ecstasy, marijuana, drug paraphernalia, and more cash and money orders were found in various locations in the kitchen and dining room. The bedrooms contained more drugs. In one bedroom, the police found Wilson's possessions, including prescription pill bottles in Wilson's name and a ring with Wilson's initials. Inside that room, the officers found powder

cocaine, crack, marijuana, heroin, 156 tabs of ecstasy, and approximately $13,000 in cash. A loaded handgun was nearby on the floor.

While the police were searching the Fouts house, Wilson had reached his friend's house, and informed Edwards (who was also at the friend's house) about the raid. Edwards and Wilson drove to Gadson's house in Anchorage and decided to stay there until things cooled off in Fairbanks. Brandon Haynes was also in Anchorage at the time. After about two weeks, Edwards returned to Fairbanks, and began buying drugs from Gadson for sale. But when Brandon Haynes returned to Fairbanks at the end of May, and resumed drug activities in a new location, Edwards switched back to Haynes as a supplier.

At some point in November 2010, the police used a confidential informant named Donny Pitka to make a controlled buy from Brandon Haynes. Pitka asked Brandon to deliver the drugs to undercover police in a vehicle near Brandon's new apartment on Adams Drive. Brandon had Powell deliver the cocaine, and the police arrested Powell when he approached the vehicle. The police then closed in on the Adams Drive apartment, arrested Brandon, and discovered cocaine, marijuana, ecstasy, oxycontin, and $14,000 in cash inside the apartment.

With Brandon Haynes in police custody, Edwards began buying again from Gadson. In January 2011, Gadson sold Edwards seven or more ounces of cocaine. By March 2011, Gadson moved up from Anchorage to 2805 Gillam Way in Fairbanks. On April 20, a federal grand jury indicted Gadson, Wilson, Brandon Haynes, Edwards, Powell, and others. Arrest warrants were issued for the defendants.

Officer Thompson picked up Gadson's trail at the end of April. After conducting several days of surveillance at Gadson's Gillam Way house and observing a good deal of "short-term traffic" indicative of drug dealing, he obtained a search warrant for the residence and garage. Officers executed the warrant at the beginning of May and found a ballistic vest and around $3,950 cash in the house. They discovered another $38,430 in a bag in the unlocked garage. The officers did not recover any firearms or an appreciable amount of cocaine from the Gillam Way house. Later that day, Gadson was arrested in his vehicle with another $1,300 on his person. Wilson turned himself in a few days later after learning of the outstanding warrant. Further investigation of the items obtained from the Gillam Way house suggested they had been used in drug transactions. A drug dog named Marley gave positive alerts for the presence of narcotics when presented with cash found at Gadson's house and on his person.

Following their arrests, Gadson, Edwards, Wilson, and Powell were all detained in the same wing of the Fairbanks Correctional Center. Pitka, who had been involved in the controlled buy that led to Brandon Haynes's arrest, was in the same prison on unrelated charges. After Powell learned about Pitka's role from his attorney, word spread to the other co-conspirators. In a series of recorded phone calls between Wilson and his cousin, Gabriella Haynes, Wilson discussed the police reports mentioning Pitka and told Gabriella Haynes that "the CI's here," using the standard abbreviation for a confidential informant. A few days later, Wilson told Gabriella that "[s]nitches can't go into the hallways." On May 21, soon after the call to Gabriella Haynes, Wilson assaulted Pitka as he was walking down the hallway. The assault lasted two minutes and was captured on video.

Although the details of the fight are disputed, the video recording shows Wilson punching Pitka, who suffered a number of abrasions, scratches, and bites from the encounter. The day after the assault, Wilson called Gabriella Haynes again and told her that he hit "Donny," who had "started this shit," and referenced the earlier controlled buy between Pitka and Brandon Haynes.

On June 23, 2011, the government charged Gadson, Wilson, and others with five crimes: conspiracy to distribute, and possession with intent to distribute, more than 500 grams of cocaine and other controlled substances, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B), (b)(1)(C), (b)(1)(D) (Count 1); possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), (b)(1)(C), (b)(1)(D) (Count 2); possession of firearms in furtherance of Counts 1 and 2, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 3); and conspiracy to retaliate against a witness, in violation of 18 U.S.C. § 1513(e) (Count 5). The government also charged Wilson with attempting to kill a witness, in violation of 18 U.S.C. § 1513(a)(1)(B), (a)(2)(B) (Count 6), and retaliation against a witness, in violation of 18 U.S.C. § 1513(b)(2) (Count 7).

On October 11, 2011, a jury found Gadson and Wilson guilty of conspiracy to distribute, possession of drugs with intent to distribute, and possession of three firearms in furtherance of the conspiracy (Counts 1, 2 and 3). Wilson was also found guilty of retaliation against a witness (Count 7). Neither was found guilty of conspiring to retaliate against a witness (Count 5), and Wilson was acquitted of attempting to kill a witness (Count 6).

On December 29, 2011, Gadson received a below-Guidelines sentence of 300 months of imprisonment and eight years of supervised release. The court attributed 10,521,103 grams of drugs to Gadson on the basis of his involvement in the conspiracy, and the sentence included, among other things, a three-level enhancement for having a managerial role. On January 27, 2012, the court sentenced Wilson to 168 months of imprisonment and five years of supervised release, a sentence that also fell below the Guideline range. The court declined to give Wilson a minor role adjustment, noting that he had been entrusted to guard the drugs and cash in the Fouts house, and that he had sold drugs to Pitka and later assaulted him.

On appeal, Gadson and Wilson challenge certain of the district court's evidentiary rulings and jury instructions. They also contest the sufficiency of the evidence as to two counts. Finally, they challenge the district court's sentencing determinations. We consider each of these challenges in turn.

II

We begin by addressing Gadson and Wilson's challenges to the district court's evidentiary rulings. Where those challenges have been preserved, we review the district court's rulings for an abuse of discretion, and uphold them unless they are "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc). We review de novo the district court's interpretations of the legal standard for its decision. *United States v. Waters*, 627 F.3d 345, 351–52 (9th Cir. 2010).

A

First, we consider Gadson's argument that the district court abused its discretion by not admitting certain out-of-court statements by his brother, Brandon Haynes.

In preparing for trial, Gadson learned that Brandon had made two statements to the police that were helpful to Gadson. Specifically, Brandon said that it was he who had put the $38,000 in cash into Gadson's garage at the Gillam Way house. Brandon also denied that he had given Gadson bags of $40,000 to $50,000, which contradicted Edwards's testimony that he had witnessed those transactions. In addition, Brandon told Wilson in a jail conversation that "[y]ou and I both know [Gadson] should not be in it," possibly referring to the case arising out of the drug operation at the Fouts house.

Gadson subpoenaed Brandon to testify at his trial, but Brandon invoked his Fifth Amendment right not to testify. At trial, Gadson moved to admit Brandon's statements under Rule 804(b)(3) of the Federal Rules of Evidence. The district court denied the motion, ruling that Brandon had given inconsistent testimony, and that this evidence was "so suspect" that "it would be a miscarriage of justice to permit it."

Gadson argues that the district court erroneously interpreted the hearsay rules and that the district court thereby abused its discretion in disallowing the evidence. According to Gadson, although Brandon's statements were hearsay, they were admissible as statements against interest under Rule 804(b)(3) of the Federal Rules of Evidence. Even if those statements did not qualify as statements against interest,

Gadson contends that their exclusion robbed him of his constitutional right to present a complete defense.

Rule 804(b)(3) provides that out-of-court statements are not excluded by the rule against hearsay if the declarant is unavailable as a witness, and the statement (1) is "truly self-inculpatory," meaning it was "sufficiently against the declarant's penal interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true," *Williamson v. United States*, 512 U.S. 594, 603–04 (1994) (internal quotation marks omitted), and (2) "is supported by corroborating circumstances that clearly indicate its trustworthiness," Fed. R. Evid. 804(b)(3)(B).[2]

---

[2] Rule 804(b)(3) states in full:

> (b) The Exceptions. The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
>
> (3) Statement Against Interest. A statement that:
>
> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
>
> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

The district court did not misinterpret the hearsay rules and did not abuse its discretion in declining to admit Brandon's statements under Rule 804(b)(3). As an initial matter, the parties agree that Brandon was unavailable within the meaning of Rule 804(b) due to his invocation of his Fifth Amendment privilege against self-incrimination. Nevertheless, Brandon's statements that Gadson "should not be in it," and that Brandon had not given Gadson two bags of cash, are not "truly self-inculpatory" for purposes of Rule 804(b)(3)(A) because they do not expose Brandon himself to criminal liability. Statements that "curry favor or deflect (or share) blame" do not fall within the scope of Rule 804(b)(3)(A). *Hernandez v. Small*, 282 F.3d 1132, 1141 n.8 (9th Cir. 2002).

Further, while Brandon's statement that he was the person who had put money in the garage at the Gillam Way house might have been self-inculpatory, the district court could have reasonably concluded that it was not supported by corroborating circumstances indicating its trustworthiness. In general, the exculpatory statements of family members "are not considered to be highly reliable," *LaGrand v. Stewart*, 133 F.3d 1253, 1268 (9th Cir. 1998); *see also United States v. Paguio*, 114 F.3d 928, 933 (9th Cir. 1997), and therefore the close family relationship between Brandon and Gadson supports the district court's determination that Brandon's statements were not trustworthy. Further, the district court's determination that Brandon's testimony was "suspect" or unreliable was supported by testimony that he had made contradictory statements to the police and his co-conspirators.

Gadson argues that there was sufficient evidence corroborating Brandon's statement that he had put the $38,000 in the Gillam Way garage. Specifically, he cites the

testimony from a downstairs tenant to the effect that someone named "Brandon" had previously lived in the apartment, and that the garage was usually unlocked. This slight evidence does not make the district court's decision to disallow Brandon's statement "illogical, implausible, or without support in inferences that may be drawn from facts in the record," *Hinkson*, 585 F.3d at 1251. Accordingly, the district court's decision not to admit the three statements at issue was not an abuse of discretion.

Nor did the exclusion of Brandon's statements deprive Gadson of his constitutional right to present a defense. The Supreme Court has held that "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," and the exclusion of evidence is unconstitutional "only where it has infringed upon a weighty interest of the accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). When the excluded evidence does not bear "persuasive assurances of trustworthiness" and is not "critical to the defense," *Chia v. Cambra*, 360 F.3d 997, 1003 (9th Cir. 2004), its exclusion does not violate a defendant's due process rights, *see United States v. Fowlie*, 24 F.3d 1059, 1069 (9th Cir. 1994) (rejecting a due process challenge to evidence excluded under Fed. R. Evid. 804(b)(3) because the statement lacked any "significant indicia of reliability" and was "tangential at best"); *cf. Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (holding unconstitutional an application of evidentiary rule that precluded the admission of a confession of guilt by a third party, where the testimony was directly exculpatory and bore "persuasive assurances of trustworthiness").

In this case, Brandon's three statements do not have any "persuasive assurances of trustworthiness" and do not

constitute critical exculpatory evidence, such as "someone else's admissions of guilt." *Fowlie*, 24 F.3d at 1069. Given Brandon Haynes's unreliability and the substantial evidence establishing that Gadson was involved in the drug transactions at the Fouts and Gillam Way houses, exclusion of Brandon's three statements did not violate Gadson's due process rights.

B

We next turn to Gadson's argument that the district court erred in admitting the government's dog sniff expert testimony without holding a *Daubert* hearing.[3]

At trial, the government sought to introduce testimony from Investigator Joshua Moore, whose dog Marley gave positive alerts for the presence of narcotics when presented with several bundles of cash found at Gadson's house and on his person.

Before testifying to the jury, Investigator Moore testified extensively during voir dire about his experience and his dog's training and reliability in the field. Investigator Moore and Marley were certified as a K-9 team in June 2010. Investigator Moore testified that he had been a canine handler since May 2010 and had received four-and-a-half weeks of training. Marley had been trained by another officer to detect marijuana, heroin, cocaine, and methamphetamine.

---

[3] Although Gadson did not join Wilson's objection at trial to the admission of this testimony without a *Daubert* hearing, we review Gadson's claim for abuse of discretion rather than plain error "because the matter was sufficiently brought to the attention of the district court." *United States v. Hieng*, 679 F.3d 1131, 1141 (9th Cir. 2012).

According to Investigator Moore, Marley had practiced in a variety of training scenarios to ensure that he was reliably detecting the presence of various odors rather than simply associating them with one specific set of circumstances. The police department logs showed that Marley had a reliability rating of 100 percent in the field and had made only one potential false positive alert. Investigator Moore also noted the limits to Marley's abilities: while he could detect the presence of four different drugs, he was unable to distinguish between individual drugs, and so an alert as to a pile of cash would indicate only that it had at some point been near one or more of those four drugs.

At the conclusion of the voir dire, the court ruled that Investigator Moore and Marley were "adequately trained and experienced to testify, to give an opinion that possibly could assist the jury in some way" and overruled Wilson's objection that the canine evidence was inadmissible without a *Daubert* hearing.

On appeal, Gadson claims that dog sniff evidence is inherently unreliable and based on junk science. In making this argument, Gadson relies on various studies and reports indicating that dog sniff errors may be caused by handler cueing and errors, or may arise because drug dogs alert to residual odors and to compounds that are not unique to contraband. *See, e.g.*, Richard E. Myers II, *Detector Dogs and Probable Cause*, 14 Geo. Mason L. Rev. 1, 14–16, 21–24 (2006); Lisa Lit, Julie B. Schweitzer, and Anita Oberbauer, *Handler Beliefs Affect Scent Detection Dog Outcomes*, 14 Animal Cognition 387 (2011). According to one expert cited by Gadson, a dog alert is insufficient to establish probable cause in a criminal case due to a high error rate. Myers, *supra*, at 14–16. In light of this evidence, Gadson

argues that Investigator Moore's testimony was not enough to demonstrate reliability, and the district court should have conducted a full hearing (as opposed to a voir dire) on the reliability of the dog sniff evidence.

We review the district court's decision to admit expert testimony for abuse of discretion. *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002), *as amended* 319 F.3d 1073 (9th Cir. 2003), *overruled in nonrelevant part by Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 467 (9th Cir. 2014) (en banc). Under Rule 702 of the Federal Rules of Evidence, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion," provided the testimony meets certain criteria. Rule 702 also requires "the trial judge [to] ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

Although the district court must perform a gatekeeping function, a trial court "not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding *how* to determine the testimony's reliability." *Mukhtar*, 299 F.3d at 1064. The inquiry into whether the testimony is sufficiently reliable is "a flexible one." *United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000). A separate pretrial hearing on reliability is not required, and a voir dire procedure can be sufficient. *Id.* at 1102–05

The Supreme Court has largely disposed of Gadson's argument that dog sniff evidence is inherently unreliable. In *Florida v. Harris*, the Supreme Court held that the Florida Supreme Court erred by imposing an unnecessarily strict

standard for evaluating whether the alert of a drug detection dog provided probable cause to search a vehicle. 133 S. Ct. 1050, 1056–57 (2013). According to *Harris*, a court can conclude that a "dog performs reliably in detecting drugs" based on the dog's training, test results, field history, and other case-specific facts. *Id.* at 1057–58. For example, "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert," although a defendant must be given the "opportunity to challenge such evidence of a dog's reliability." *Id.* at 1057. This conclusion disposes of Gadson's claim that dog sniff evidence is per se unreliable because it is based on "junk science."

Moreover, *Harris* did not suggest that a district court had to perform a full-fledged *Daubert* hearing to determine whether the dog sniff testimony was sufficiently reliable to establish probable cause. *Id.* at 1056–58. Rather, the Court held that both the state and the defendant can proffer evidence relating to the dog's reliability, and the court can "then evaluate the proffered evidence to decide what all the circumstances demonstrate. If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause." *Id.* at 1058. A district court considering whether evidence of a dog alert is admissible under Rule 702 can undertake a similar evaluation. Here, Gadson had ample opportunity to cross-examine Moore, "contest the adequacy of a certification or training program," or raise "circumstances surrounding a particular alert" that undercut Marley's reliability. *Id.* at 1057. This was sufficient to satisfy the district court's gatekeeping function, and the court did not abuse its discretion in declining to do more.

Given *Harris*'s determination that a dog's alert that meets certain reliability requirements may be sufficient to "make a reasonably prudent person think that a search would reveal contraband or evidence of a crime," *id.* at 1058, we conclude that a dog's alert that meets such requirements is also sufficiently reliable to be admissible under Rule 702. Under the standard enunciated in *Harris*, the evidence regarding the reliability of Marley's alert was more than adequate. Investigator Moore gave extensive testimony regarding his and Marley's training and certification. He also testified regarding Marley's reliability rating of 100 percent in the field. The defendants did not proffer evidence to the contrary. Accordingly, the district court did not abuse its discretion in admitting evidence of Marley's alert.

C

We now consider Wilson's claim that the district court erred by admitting the recordings of the prison phone calls made by Gadson and Wilson to third parties because the tapes had not been properly authenticated in violation of Rule 901 of the Federal Rules of Evidence. Wilson further claims that Officer Thompson's testimony was insufficient to support a finding that the voices on the tapes belonged to the defendants.

Because neither Gadson nor Wilson challenged the authentication of the tapes themselves at trial, we review this claim for plain error. *See United States v. Lindsey*, 634 F.3d 541, 550–51 (9th Cir. 2011). Plain error is "(1) error, (2) that is plain, (3) that affect[s] substantial rights," and "(4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cotton*, 535 U.S. 625, 631 (2002) (alteration in original, internal

citations and quotations marks omitted). Wilson did challenge the district court's decision that the government put forth sufficient evidence that the voices on the tapes belonged to Gadson and Wilson, and so we review that determination for abuse of discretion. *See United States v. Yin*, 935 F.2d 990, 994 (9th Cir. 1991).

Under Rule 901(a) of the Federal Rules of Evidence, in order "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." In other words, the party offering the evidence must make a prima facie showing of authenticity "so that a reasonable juror could find in favor of authenticity or identification." *Yin*, 935 F.2d at 996 (internal quotation marks omitted). The item may be authenticated by extrinsic evidence, *id.* at 995, such as through testimony of a knowledgeable witness, Fed. R. Evid. 901(b)(1). Thus, where the government offers an audiotape, a witness with knowledge may testify that the recording is what it purports to be, or is a true and accurate copy of the original. *See United States v. Panaro*, 266 F.3d 939, 951 (9th Cir. 2001); *United States v. Mouton*, 617 F.2d 1379, 1383–84 (9th Cir. 1980). Where the government offers a tape recording of the defendant's voice, it must also make a prima facie case that the voice on the tape is in fact the defendant's, whether by means of a witness who recognizes the voice or by other extrinsic evidence. *United States v. Torres*, 908 F.2d 1417, 1425 (9th Cir. 1990). Once the offering party meets this burden, "the probative value of the evidence is a matter for the jury." *United States v. Workinger*, 90 F.3d 1409, 1415 (9th Cir. 1996). The district court does not abuse its discretion in admitting evidence that meets the minimum requirements for authentication. *Id.* at 1416.

Here, Officer Thompson testified that he was familiar with the prison telephone system and gave detailed testimony regarding how the system recorded all calls, how the jail call log could be searched based on date, phone bank, and telephone number, and how he had run such searches many times. He testified that he reviewed more than 100 hours of prison phone calls relating to Gadson and Wilson. Although Officer Thompson did not testify that the calls introduced at trial were accurate copies of the prison recordings, neither defendant challenged the recordings on this basis. Officer Thompson's testimony was "sufficient to support a finding that the item is what the proponent claims it is," Fed. R. Evid. 901(a), and the district court did not err in failing to raise this issue sua sponte.

Nor did the district court abuse its discretion in concluding that the government had carried its burden of making a prima facie case that the voices on the tapes were those of Gadson and Wilson. Officer Thompson testified as to the methodology he had used to identify the speakers. He first listened to recordings of all phone calls made from the cell wing in the prison where the defendants were held during the applicable time period and scanned those calls for context clues suggesting the identity of the speaker. Officer Thompson identified Gadson's voice on the recording based on several factors: he had met Gadson and was familiar with his "very unique" voice, he determined that almost all of Gadson's calls were to Gabriella Haynes, and in at least one conversation, Officer Thompson heard Gadson talking about a list of items which had been seized from his house during the search, information accessible to only a handful of people at that time.

Officer Thompson identified Wilson's voice in the recording based on other extrinsic evidence. First, Officer Thompson heard the voice of a different prisoner calling Gabriella Haynes shortly after Wilson was admitted. Because the other defendants had previously been detained, Officer Thompson reasonably inferred that this new voice belonged to Wilson, the last member of the drug operation to be arrested. Second, during the time Wilson was in the segregation unit, he had to make written requests to use the telephone, and the timing of Wilson's requests corresponded with the new voice's calls to Gabriella Haynes. Finally, the caller discussed facts particular to Wilson's case.

Officer Thompson sufficiently narrowed the universe of possible callers so as to support an inference that the speakers in these calls were Gadson and Wilson. *Cf. Yin*, 935 F.2d at 996; *Torres*, 908 F.2d at 1425. Because the district court's admission of this testimony was not "illogical, implausible, or without support in inferences that may be drawn from facts in the record," *Hinkson*, 585 F.3d at 1251, it did not abuse its discretion in admitting it.

## III

We next consider Wilson's multiple arguments regarding the district court's admission of Officer Thompson's testimony regarding the recorded phone calls.

## A

Because the sound quality of the tape recordings was poor, Wilson claims that Officer Thompson was acting as a government-produced transcript of the recordings, and the court did not take the necessary steps to ensure the accuracy

of the transcript or interpretation. Because neither defendant raised this claim at trial, we review it for plain error. *See Lindsey*, 634 F.3d at 550–51. Applying this standard, we conclude the district court did not plainly err. Officer Thompson's testimony regarding the context of the phone calls and interpretation of ambiguous or vague statements was not akin to a verbatim transcript of the calls, and thus the district court did not commit plain error in not considering sua sponte whether sufficient steps were taken to ensure the statements' accuracy. *Cf. United States v. Armijo*, 5 F.3d 1229, 1234 (9th Cir. 1993) (considering various factors regarding the accuracy of a transcription translating recorded telephone calls from Spanish to English). Moreover, even under the standard applied to written transcripts, there were ample indicia of accuracy, given that defense counsel had the opportunity to challenge the accuracy of Officer Thompson's testimony and to introduce alternative versions, and the district court informed the jury on at least three occasions that the calls, not Officer Thompson's testimony, were the evidence. *See id*.

Nor did Wilson establish that the district court plainly erred in admitting the tapes on audibility grounds. "A recorded conversation is generally admissible unless the unintelligible portions are so substantial that the recording as a whole is untrustworthy." *United States v. Lane*, 514 F.2d 22, 27 (9th Cir. 1975). Wilson has not shown that the tapes were so uniformly unintelligible that the recordings should not have been presented to the jury. No objection was made at trial on this basis. Nor was there evidence "that persons in the courtroom were unable to hear substantial portions of the conversations recorded on the tapes, or that the words were unintelligible." *United States v. Tisor*, 96 F.3d 370, 377 (9th Cir. 1996). Further, Wilson waived or forfeited this argument

by opposing efforts to provide the original recordings to the jury during their deliberations.  When the jury requested the original telephone recordings (rather than the courtroom recordings of the clips as they were played during the trial), Wilson objected to giving the jury the original clips. Although the government proposed to give the jury "the clearest possible version" of the clips played at trial, Wilson argued against various approaches suggested by the government that would have enabled the jury to hear the originals, and contended that the jury should be limited to the recording of what was played in court.[4]  Consequently, the district court's failure to sua sponte exclude the tapes was not plain error.

B

Second, Wilson asserts that the district court erred in allowing Officer Thompson to testify concerning the content of the telephone calls.  Wilson claims this type of testimony is inadmissible because it does not meet the criteria for lay opinion testimony under Rule 701 of the Federal Rules of Evidence.  According to Wilson, Officer Thompson's testimony was inadmissible under this rule because Officer Thompson was not a percipient witness to the conversations, his testimony was based on the investigation as a whole, his interpretation of vague testimony usurped the jury's role as trier of fact, and his interpretation of one phone call relied on hearsay.

---

[4] Accordingly, the dissent errs in asserting that in response to the jury's request for the tapes, defendants merely "consent[ed] to the district court's chosen solution" to the jury's request for the tapes.  Dissent at 75 & n.3.

Our consideration of Wilson's arguments requires us to examine the scope of Rule 701.  Rule 701 allows a lay witness to offer opinions that are (a) "rationally based on the witness's perception," (b) "helpful" to the jury, and (c) "not based on scientific, technical, or other specialized knowledge within the scope of" expert testimony.  When promulgated in 1975, this rule represented a departure from the then-prevailing evidentiary principles governing lay witness testimony, which generally required witnesses "to limit their testimony just to the facts they perceived and avoid opinions or inferences based on those facts."  29 Charles Alan Wright & Victor James Gold, *Federal Practice & Procedure* § 6251, at 105 (1997).  Courts justified this approach on the grounds that "lay-witness opinion usurps the role of the jury, whose job it is to draw conclusions as to the meaning of the evidence," and because "testimony limited to perceived facts was considered more reliable than mere opinion, which could be misleading."  *Id.* § 6252, at 109.

The drafters of Rule 701 rejected both these distinctions. First, the distinction between "fact" and "opinion" proved to be unworkable in practice.  *See* Fed. R. Evid. 701 advisory committee's note (noting "the practical impossibility of determining by rule what is a 'fact'" and that "[w]itnesses often find difficulty in expressing themselves in language which is not that of an opinion or conclusion"); *see also United States v. Pierson*, 503 F.2d 173, 176 (D.C. Cir. 1974) (stating that the "so-called opinion rule" was "not strictly followed—due in large part to the difficulty of drawing a fine distinction between fact and opinion").  Indeed, as the D.C. Circuit explained, "[t]here is no conceivable statement however specific, detailed and 'factual,' that is not in some measure the product of inference and reflection as well as observation and memory."  *Pierson*, 503 F.2d at 176 (quoting

*McCormick on Evidence* § 11 (1972)).  The drafters of Rule 701 also rejected the concern that lay opinion testimony would mislead juries.  Rule 701 assumes instead that "the natural characteristics of the adversary system will generally lead to an acceptable result," and weaknesses in the lay witness's testimony can be emphasized through "cross-examination and argument."  Fed. R. Evid. 701 advisory committee's notes; *see also United States v. Beck*, 418 F.3d 1008, 1015 (9th Cir. 2005) (noting that "direct and cross-examination of a lay witness testifying as to his or her opinion is relied upon to verify the accuracy of the testimony").

In applying Rule 701 to the lay opinion testimony of law enforcement officers, we have held that an officer's interpretation of intercepted phone calls may meet Rule 701's "perception" requirement when it is an interpretation "of ambiguous conversations based upon [the officer's] direct knowledge of the investigation."  *United States v. Freeman* (*Kevin Freeman*), 498 F.3d 893, 904–05 (9th Cir. 2007); *see also United States v. Simas*, 937 F.2d 459, 464–65 (9th Cir. 1991) (finding no abuse of discretion in admitting officers' lay testimony "concerning their understanding of what [defendant] meant to convey by his vague and ambiguous statements").[5]  In *Kevin Freeman*, for instance, we held that once the government established a foundation, a police

---

[5] The majority of the circuits allow officers to provide interpretations of recorded conversations based on their knowledge of the investigation, subject to various safeguards.  *See United States v. Albertelli*, 687 F.3d 439, 444–48 (1st Cir. 2012); *United States v. El-Mezain*, 664 F.3d 467, 513–14 (5th Cir. 2011); *United States v. Jayyousi*, 657 F.3d 1085, 1102–03 (11th Cir. 2011); *United States v. Rollins*, 544 F.3d 820, 830–33 (7th Cir. 2008); *United States v. Garcia*, 994 F.2d 1499, 1506–07 (10th Cir. 1993); *United States v. De Peri*, 778 F.2d 963, 977–78 (3d Cir. 1985).

officer could provide lay witness opinion testimony regarding the meaning of statements in the defendant's intercepted phone calls because the testimony was based on the officer's "direct perception of several hours of intercepted conversations—in some instances coupled with direct observation of [the defendants]—and other facts he learned during the investigation." 498 F.3d at 904–05; *see also United States v. El-Mezain*, 664 F.3d 467, 513–14 (5th Cir. 2011) (allowing lay opinion testimony interpreting telephone calls when "the agents' opinions were limited to their personal perceptions from their investigation of this case"); *United States v. Rollins*, 544 F.3d 820, 830–33 (7th Cir. 2008) (finding no error in the district court's decision to allow the agent's testimony regarding his "impressions" of recorded conversations when the testimony was "based on the agent's perceptions derived from the investigation of this particular conspiracy"). Such testimony is admissible even if the testifying officer was not a participant in the recorded conversation. *Kevin Freeman*, 498 F.3d at 904; *see also United States v. Jayyousi*, 657 F.3d 1085, 1102 (11th Cir. 2011) (holding that a lay witness's testimony was admissible even though "he did not personally observe or participate in the defendants' conversations"); *United States v. Garcia*, 994 F.2d 1499, 1507 (10th Cir. 1993) (admitting an officer's opinion based only "on listening to the conversations between coconspirators").

Lay witness testimony regarding the meaning of ambiguous conversations based on the witness's direct perceptions and experience may also prove "helpful to the jury" for purposes of Rule 701. *See Kevin Freeman*, 498 F.3d at 904–05 (agent's "understanding of ambiguous phrases" based on the "direct perception of several hours of intercepted conversations" along with "direct observation" of defendants

and "other facts he learned during the investigation" resulted in testimony that "proved helpful to the jury in determining what the [co-conspirators] were communicating during the recorded telephone calls"); *see also Rollins*, 544 F.3d at 832–33 (agent's testimony based on listening to every intercepted conversation, and other "personal observations and perceptions" related to the specific case at issue "assisted the jury in determining several facts in issue").

On the other hand, an officer's testimony interpreting recorded conversations may fall outside the scope of Rule 701 if it is not based on the witness's perception (for example, if it is based on speculation or hearsay) or is not helpful to the jury. *Kevin Freeman*, 498 F.3d at 905. Lay testimony is not helpful to the jury if it merely provides "'interpretation of *clear* statements'" that are within the common knowledge of the jury. *Id.* (quoting *United States v. Dicker*, 853 F.2d 1103, 1109 (3d Cir. 1988)). In *Dicker*, for instance, a government agent testified about the meaning of recorded conversations, and explained that the parties to the conversation were discussing means for obtaining "phony paperwork." 853 F.2d at 1106. But the recorded conversations themselves did not include any discussion of phony paperwork, and there was no indication "that the documents to be obtained were not to be genuine." *Id.* at 1105. Under these circumstances, *Dicker* held that the officer's mischaracterization of the plain words used in the conversation was not helpful to the jury, and thus barred by Rule 701. *Id.* at 1108–10; *see also United States v. Freeman* (*Marcus Freeman*), 730 F.3d 590, 597 (6th Cir. 2013) (holding that Rule 701 barred an officer's testimony which essentially "spoon-fed his interpretations of the phone calls and the government's theory of the case to the jury, interpreting even ordinary English language"); *Rollins*,

544 F.3d at 833 (admitting an agent's "impressions" regarding an intercepted conversation because the agent "was not merely telling the jury what result to reach as to the defendants' culpability"). As the drafters of Rule 701 noted, "meaningless assertions which amount to little more than choosing up sides" should be excluded for lack of helpfulness. Fed. R. Evid. 701 advisory committee's note. In addition, testimony that relies on or conveys hearsay evidence, such as when an officer relies on the truth of a third party's statement as the basis for an interpretation of a statement in an intercepted phone call, is also inadmissible, both because it would not be based on the officer's own perceptions, and would not be helpful. *Kevin Freeman*, 498 F.3d at 905. Any error in admitting lay opinion testimony under Rule 701, however, could be harmless if in light of the evidence as a whole, there was a "fair assurance that the jury was not substantially swayed by the error." *Id.* (internal quotation marks omitted).

A minority of circuits have construed Rule 701 much more narrowly and barred officers from interpreting intercepted communications based on their review of the recordings and personal involvement in an investigation. Thus in *United States v. Hampton*, 718 F.3d 978 (D.C. Cir. 2013), the D.C. Circuit determined that a district court had violated Rule 701 by allowing an FBI agent to testify regarding intercepted conversations, even though the government established that the FBI agent had been in charge of the investigation, monitored wiretaps, performed physical surveillance, supervised other agents who monitored the wiretaps, and had reviewed each of the 20,000 conversations intercepted by the wiretaps. *Id.* at 981–83. According to the D.C. Circuit, such testimony raised a risk that the agent "was testifying based upon information not before the jury" and the

jury "had no way of verifying his inferences or of independently reaching its own interpretations." *Id.* at 983 (internal quotation marks omitted); *see also United States v. Grinage*, 390 F.3d 746, 750–51 (2d Cir. 2004) (same).

We disagree with this approach, which harkens back to the evidentiary policies that were rejected by the drafters of Rule 701. A lay witness's opinion testimony necessarily draws on the witness's own understanding, including a wealth of personal information, experience, and education, that cannot be placed before the jury. If witnesses cannot draw on their experience and knowledge, they are effectively limited to presenting factual information. Such an approach echoes the now-abandoned distinction between allowing testimony regarding "facts" but not "opinions," and revives the historical policy that admitting lay opinion testimony usurps the role of the jury, a view that was rejected by the Rule 701 drafters. *See Hampton*, 718 F.3d at 983; *id.* at 986 (Brown, J., concurring); *Grinage*, 390 F.3d at 749–51.

Rule 701 does not impose such a limitation. Under Rule 701, while the district court must exercise its discretion wisely to minimize problems that may arise in admitting lay opinion testimony, *see Albertelli*, 687 F.3d at 447 (listing dangers and safeguards), the guiding policy of the Rule is to trust the jury to identify unreliable opinion testimony with the help of the adversary process, *see* Fed. R. Evid. 701 advisory committee's note. Courts regularly admit lay opinion testimony regarding the identity of a person in a photograph, *see, e.g.*, *Beck*, 418 F.3d at 1014–15, and voice identification testimony, *see, e.g.*, *United States v. Thomas*, 586 F.2d 123, 133 n.23 (9th Cir. 1978), even though the witness provides such identification based on past contacts with the pertinent individual that are outside the jury's knowledge. Similarly,

an investigator who has accumulated months or even years of experience with the events, places, and individuals involved in an investigation necessarily draws on that knowledge when testifying; indeed, it is those out-of-court experiences that make the witness's testimony helpful to the jury. Contrary to the rationale of *Hampton* and *Grinage*, "the application of Rule 701 should not be influenced by concern that opinion testimony usurps the role of the jury or that factual testimony is more reliable than opinion testimony."[6]  Wright, *supra*, § 6252, at 112.

We now consider Wilson's arguments in light of these principles. "The admissibility of lay opinion testimony under Rule 701 is committed to the sound discretion of the trial judge and his decision will be overturned only if it constitutes a clear abuse of discretion." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051 (9th Cir. 2008) (quoting *United States v. Yazzie*, 976 F.2d 1252, 1255 (9th Cir. 1992)). Because Wilson did not challenge Officer Thompson's testimony under Rule 701 at trial, we review for plain error. *See Lindsey*, 634 F.3d at 550–51.

1

First, Wilson argues that Officer Thompson could not offer his interpretations of the recorded phone conversations under Rule 701, because lay opinion testimony is admissible

---

[6] We therefore decline the dissent's invitation to adopt a rule that a lay witness (or at least an officer) cannot provide lay opinion testimony based on information and experiences that are within the lay witness's knowledge, but have not been put before the jury. Dissent at 65, 70. Such a rule would not be consistent with the plain language of Rule 701 or our decision in *Kevin Freeman*.

only when a witness was a party to the conversation himself or was a percipient witness. Because we rejected this precise argument in *Kevin Freeman*, 498 F.3d at 904–05, the district court did not plainly err in not striking Officer Thompson's testimony on this ground.

2

Next, Wilson claims that Officer Thompson's interpretation was inadmissible because it was based on the investigation as a whole, including the police report and information contributed by other officers, rather than merely his personal observations. The district court did not plainly err in failing to strike Officer Thompson's testimony on this ground. According to his testimony, Officer Thompson had been involved in the investigation of the drug conspiracy since early 2010. His involvement spanned the searches of the Fouts house, the multi-day surveillance of the Gillam Way house, the search of the Gillam Way house, and the review of around 100 hours of prison phone calls. In light of our decision in *Kevin Freeman*, where we admitted testimony based on similar experiences, the district court had ample grounds to conclude that Officer Thompson based his interpretations on his personal knowledge of facts he learned during the investigation.

In arguing against this conclusion, Wilson relies on *Marcus Freeman*, in which the Sixth Circuit held that an agent's testimony was not admissible under Rule 701 because it was based solely on the agent's review of 23,000 phone conversations, rather than on the agent's involvement in the investigation. 730 F.3d at 596–99. The facts of *Marcus Freeman* are quite different from our case, however. In *Marcus Freeman*, the government conceded that the

testifying agent "lacked the first-hand knowledge required to lay a sufficient foundation for his testimony under Rule 701(a)." *Id.* at 597. Because the agent had not been involved in the surveillance of the defendant, and had not observed "any activity relevant to interpreting the calls," the agent relied solely on "the general knowledge of the FBI and the investigation as a whole." *Id.* at 596. Nor did the agent shed light on the meaning of ambiguous statements based on personal knowledge regarding the investigation; rather the agent essentially "spoon-fed his interpretations of the phone calls and the government's theory of the case to the jury, interpreting even ordinary English language." *Id.* at 597. Under these circumstances, the agent's testimony was not "rationally based" on his own concrete perceptions regarding the investigation and was not helpful to the jury, as required by Rule 701. Here, by contrast, Officer Thompson had the requisite personal experience and knowledge of the investigation, had reviewed the phone calls in the context of that knowledge, and did not merely regurgitate the government's theory of the case. Because the government established a foundation for Officer Thompson's testimony, while such a foundation was fatally lacking in *Marcus Freeman*, *Marcus Freeman* has little bearing on Wilson's claims.

3

Along the same lines, Wilson argues that the district court erred in not sua sponte striking Officer Thompson's interpretation of Wilson's reference to "Powell" to mean "Joe Powell," and his interpretation of Wilson's references to "Donte" and "they have him on tape" to mean the police had Donte Edwards on tape. Wilson argues that this interpretation of vague testimony usurps the jury's function.

We disagree. Officer Thompson's testimony was based on his knowledge of the investigation and the persons involved, evidence that was also before the jury. Because a jury may become confused by vague pronouns such as "who," "him," and "that," Officer Thompson's testimony would provide helpful context. *See Kevin Freeman*, 498 F.3d at 900, 902 (holding that an officer's interpretation of "ambiguous statements consisting of ordinary terms," like "that" was admissible as lay opinion testimony).

The dissent highlights a particular conversation, where Wilson stated "'You know, he's the one'"—referring to the informant Pitka—"'that started this shit.' . . . 'That time with Batman, that was him.'" Dissent at 78. At trial, Officer Thompson explained that "Batman" refers to Brandon Haynes, and Wilson's statement "that time" refers back to the November 2010 incident (in which Officer Thompson was involved) where Pitka executed a controlled buy from Brandon which led to Brandon's eventual arrest. As the dissent recognizes, *id.*, Officer Thompson's testimony that "Batman" was Brandon's nickname is precisely the type of investigation-specific opinion testimony that *Kevin Freeman* authorizes. But contrary to the dissent, *id.*, Officer Thompson's explanation of "that time" is likewise admissible, because *Kevin Freeman* permits "interpretations of ambiguous conversations based upon [the officer's] direct knowledge of the investigation," 498 F.3d at 904–05. For instance, *Kevin Freeman* approved of the officer's interpretation of the statement, "Man, it's done already" to mean "he's given the cocaine to Kevin Freeman and that he's received his money for it." *Id.* at 902. According to *Kevin Freeman*, such interpretations "did nothing more than offer one possible framework for understanding the conversation." *Id.* Officer Thompson's testimony regarding

his interpretation of "that time" falls comfortably within the same range of interpretive testimony. At the very least, it was not plain error for the district court to allow the testimony. Indeed, the dissent advances no reason why the district court's failure to cut off Officer Thompson's testimony sua sponte was "clear" or "obvious" error, *United States v. Olano*, 507 U.S. 725, 734 (1993) (internal quotation marks omitted), in light of our settled law allowing this type of testimony.[7]

4

We next turn to Gadson's hearsay challenge to the admissibility of Officer Thompson's testimony characterizing statements made by Brandon Haynes.[8]  As we have explained, lay opinion testimony may not convey or rely on hearsay, because it is not helpful to the jury. *Kevin Freeman*, 498 F.3d at 905.

During Officer Thompson's testimony about one of the prison phone calls, he noted that Wilson was

---

[7] We have carefully considered—and rejected—each of Wilson's challenges to specific statements by Officer Thompson.  The dissent, however, points to several additional parts of the trial transcript, where the dissent claims Officer Thompson repeated clear words or speculated as to their meaning.  Dissent at 77–78.  Wilson himself did not cite these statements, let alone argue that the district court erred in failing to strike them or that the admission of such testimony was prejudicial.  Because Wilson never raised such arguments, and the government has not had an opportunity to respond, we decline to address them here.  *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (stating that we "will not manufacture arguments for an appellant").

[8] In his brief, Wilson states that he joins this argument. Fed. R. App. P. 28(i).

> reading off of a portion of the [police] report that we made after interviewing Brandon Haynes. You hear Brandon Haynes . . . in the background . . . [say] 'Hell, no.' One thing we learned throughout this investigation is that in different phone calls [Brandon Haynes] made numerous denials to everyone, even though we had a video-recorded, audio-recorded interview with Mr. Haynes where he made these admissions to us.

Gadson's counsel made a hearsay objection to "the purported admissions of Brandon Haynes," but the district court implicitly denied the objection.

According to Gadson, Officer Thompson's statement that Brandon "made these admissions to us" is hearsay that is not admissible under any exception. We disagree. Officer Thompson's statement that Brandon "made these admissions to us" does not meet the definition of hearsay: a statement that is offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). Officer Thompson did not testify as to the nature of "these admissions," repeat any assertion made by Brandon, or suggest that the jury should consider any admission made by Brandon to be truthful. Rather, Officer Thompson mentioned Brandon's admissions to the police as context for the recorded phone call, and to explain why the jurors would hear Brandon state "Hell, no" in the background. A witness making statements to provide clarification and context for other statements is not offering evidence for the truth of the matter asserted, and such testimony does not run afoul of any hearsay prohibition. *See United States v. Collicott*, 92 F.3d 973, 981 n.7 (9th Cir. 1996); *see also United States v. Whitman*, 771 F.2d 1348,

1352 (9th Cir. 1985) (no error where informant's recorded statements were only offered "to show that they were made," and to put the statements in context, rather than for their truth). Accordingly, the district court did not abuse its discretion in declining to strike this testimony.

5

Finally, Wilson argues that the district court erred in allowing Officer Thompson to provide his interpretation of drug jargon such as "nine of leaded" (crack cocaine), or "a strap" (firearm), because he had not been qualified as an expert witness.[9] Because neither Gadson nor Wilson objected at trial to the drug jargon testimony as impermissible expert testimony, we review this claim for plain error. *See United States v. Pino-Noriega*, 189 F.3d 1089, 1097 (9th Cir. 1999).

"[L]aw enforcement testimony about the meaning of drug jargon may be both expert and lay testimony, depending on the circumstances." *United States v. Reed*, 575 F.3d 900, 922 (9th Cir. 2009). Unlike a lay witness, a witness who is an expert on drug jargon may interpret encoded drug terms even if the witness had not been involved in that particular investigation. *See id.* And so police officers' testimony regarding drug terms related to an investigation may be expert opinion testimony, lay opinion testimony, or both. Although we have noted the difficulties that may arise when an agent qualified as an expert also provided lay testimony,

---

[9] The dissent suggests that Officer Thompson should have been qualified as an expert before offering any of his opinions because he used "specialized equipment" to listen the phone calls. Dissent at 70. None of the parties objected to Officer Thompson's testimony on this basis at trial, and Wilson has not raised this argument on appeal.

*see Kevin Freeman*, 498 F.3d at 903–04, we have nevertheless held that such dual use of "case agents as both expert and lay witnesses is not so inherently suspect that it should be categorically prohibited." *Id*. at 904.

Our concerns regarding a witness who qualifies as an expert giving lay opinion testimony are not directly applicable when an agent who is providing lay testimony also interprets a few drug terms in the context of discussing personal observations. While witnesses who testify as an expert may receive "unmerited credibility" for their lay testimony, because expert testimony is "likely to carry special weight with the jury," *id.* at 903 (internal quotation marks omitted), the converse is not true: a lay witness's testimony carries no special weight, even if at points the lay witness has recourse to relevant background and training. Similarly, there is no special risk that lay testimony regarding firsthand observations would be merely speculative. *Cf. id.* at 904. We have also expressed concern that because expert witnesses may opine on matters about which they have no personal knowledge, they may also rely on inadmissible hearsay when providing lay testimony. *Id.* Such a danger does not necessarily arise when lay witnesses are testifying about matters in which they were involved.

Here, Officer Thompson testified primarily as a lay witness providing his firsthand knowledge of the case; he referenced his reliance on training and police experience (as opposed to familiarity with the individuals through the specific investigation) only when defining the single term "nine of leaded." This isolated instance does not raise the concerns identified in *Kevin Freeman*. Further, the district court could reasonably conclude that Officer Thompson encountered the two terms at issue in the context of his

investigation as well as through his training and experience. *See Reed*, 575 F.3d at 922. "Because the distinction between lay and expert testimony in this context is a fine one, we do not fault the district court for failing to intervene sua sponte."[10] *Kevin Freeman*, 498 F.3d at 904.

We also reject Wilson's argument that Officer Thompson's reference to police reports, or to his use of special equipment to review the tapes, gave him an unwarranted aura of special knowledge. Wilson did not raise this argument at trial, and the district court did not plainly err in not addressing sua sponte this concern.

C

Both defendants object to a specific portion of Officer Thompson's testimony in response to questioning by Wilson's attorney. After Officer Thompson had testified regarding the recorded prison phone calls, Wilson's attorney engaged him in the following colloquy:

> [Wilson's attorney]: [N]onetheless, when we come into the life or come into the courtroom,

---

[10] Further, the admission of Officer Thompson's definition of these terms did not affect the defendants' substantial rights, because the evidence regarding Officer Thompson's background and experience (he had been assigned to the statewide drug enforcement unit for the previous three and a half years and had received several hundred hours of training in drug-related investigations) would have qualified him to give expert testimony on this subject. *See United States v. Figueroa-Lopez*, 125 F.3d 1241, 1247 (9th Cir. 1997) (holding that the admission of lay testimony about countersurveillance operations was harmless because witness was indeed qualified to give expert opinion testimony on that subject).

> wherever we go, we bring our own position and biases with us.
>
> [Officer Thompson]: I would agree.
>
> [Wilson's Attorney]: Right. So you would have a tendency to project a police officer's interpretation onto things?
>
> [Officer Thompson]: I would—I would state yes, that I think I put a— a— good case together, and I'm confident of the people charged in the case are guilty of the crimes.

Gadson's counsel objected to Officer Thompson's answer on the ground that it constituted vouching. The district court did not strike the answer, but stated before the jury: "[u]ltimately it's up to the jury to determine guilt or innocence, and so the jury should consider all the evidence presented in that regard."

On appeal, Gadson renews his argument that Officer Thompson's statement constituted impermissible vouching because it was Officer Thompson's personal opinion of the defendants' guilt. Wilson joins this argument, and also argues that Officer Thompson's opinion was improper because it went to the ultimate issue of the defendants' guilt, in violation of Rule 704(b) of the Federal Rules of Evidence.

Prosecutors may not place "the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir.

1993). By putting an unwarranted imprimatur of credibility or authority on the testifying witness, a prosecutor may "jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." *United States v. Weatherspoon*, 410 F.3d 1142, 1146–48 (9th Cir. 2005) (internal citations omitted). In this case, however, the government did not elicit Officer Thompson's testimony, nor did it vouch for his credibility "either by putting its own prestige behind the witness, or by indicating that extrinsic information not presented in court supports the witness'[s] testimony." *United States v. Garcia-Guizar*, 160 F.3d 511, 520 (9th Cir. 1998) (internal quotation marks omitted). Rather, Officer Thompson testified only that he was confident about his own testimony after defense counsel attacked his credibility. The defendants have not pointed to any case suggesting that such testimony constitutes impermissible vouching. Accordingly, the district court did not err in declining to strike the testimony on that ground.

Wilson argues that the district court erred in not striking Officer Thompson's response because it was an opinion on the ultimate issue of guilt or innocence. Under Rule 704(b), an expert witness in a criminal case "must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." We have interpreted this rule as precluding an expert witness from offering "a direct opinion on the defendant's guilt or innocence." *Kevin Freeman*, 498 F.3d at 906. But Rule 704(b) is inapplicable by its terms. Officer Thompson was not testifying as an expert witness here. The defendants have cited no cases applying Rule 704(b) to a lay witness, and there is no basis for doing so under the text of the rule. Accordingly, the

district court did not err in not striking the testimony on Rule 704(b) grounds.[11]

IV

Gadson raises two challenges relating to the government's reliance on *Pinkerton v. United States*, 328 U.S. 640 (1946), to obtain his conviction for possessing firearms in furtherance of drug trafficking offenses under 18 U.S.C. § 924(c)(1).[12] At trial, the government relied on *Pinkerton*, which "renders all co-conspirators criminally liable for reasonably foreseeable overt acts committed by others in furtherance of the conspiracy they have joined, whether they were aware of them or not." *United States v. Hernandez-Orellana*, 539 F.3d 994, 1007 (9th Cir. 2008). The jury found Gadson guilty with respect to a shotgun and handgun found inside the Fouts house, but not guilty with respect to a rifle found outside.

---

[11] Indeed, even if Officer Thompson had testified as an expert witness, any error in failing to strike his remark would have been harmless. In analogous circumstances, we have held that a failure to strike a single comment over the course of a lengthy trial was not plain error when the government did not rely on the comment in its arguments to the jury. *Cf. United States v. Gomez-Osorio*, 957 F.2d 636, 642 (9th Cir. 1992). The government did not cite Officer Thompson's comment at all. Moreover, the court gave an immediate curative instruction to the jury, stating that: "[u]ltimately it's up to the jury to determine guilt or innocence, and so the jury should consider all the evidence presented in that regard."

[12] The statute provides that "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—(i) be sentenced to a term of imprisonment of not less than 5 years." 18 U.S.C. § 924(c)(1)(A).

Gadson challenges the instruction on *Pinkerton* liability given to the jury, arguing that it allowed him to be convicted without a showing that the coconspirators' use of the firearms was reasonably foreseeable to him.  He also challenges the sufficiency of the evidence to convict him under a *Pinkerton* theory.

A

We begin by considering the district court's instruction on *Pinkerton* liability:

> [Y]ou may find the defendant guilty of . . . possession of a firearm in furtherance of . . . drug trafficking, Count 3, if the government has proved each of the following elements beyond a reasonable doubt:
>
> First, a person named in the respective count of the first superseding indictment committed the crime as alleged in the count.  Second, the person was a member of the conspiracy charged in Count 1 of the superseding indictment.  Third, the person committed the crime in furtherance of the conspiracy . . . . Fourth, the defendant was a member of the same conspiracy at the time the offense was committed.  And, fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

Gadson claims that this instruction misstated the law. He focuses on the portion of the court's instruction which stated that the jury could find Gadson guilty of the firearm offense committed by a coconspirator only if the government proved beyond reasonable doubt that the offense "could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement." According to Gadson, the instruction failed to convey to the jury that it had to find that the offense was reasonably foreseeable *to Gadson*, not just objectively reasonably foreseeable to a coconspirator.

Neither Gadson nor Wilson raised this particular objection to the *Pinkerton* instruction, and so our review is for plain error. *See United States v. Kessi*, 868 F.2d 1097, 1102 (9th Cir. 1989) (one type of objection to an instruction does not necessarily preserve another objection if there was no reason to believe the district court was fully aware of that objection). We conclude that the district court did not plainly err in formulating its *Pinkerton* instruction. The instruction directly tracks the language of *Pinkerton*, which held that coconspirator liability would not extend to a case where

> the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.

328 U.S. at 647–48. Moreover, we have upheld an identical instruction as "an accurate statement of the applicable law." *United States v. Alvarez-Valenzuela*, 231

F.3d 1198, 1202–03 (9th Cir. 2000).[13]  Indeed, the Ninth Circuit Model Criminal Jury Instruction 8.25 requires only that "the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a

---

[13] The instruction upheld in *Alvarez-Valenzuela* was as follows:

Each member of a conspiracy is responsible for the actions of the other members performed during the course and in furtherance of the conspiracy. If one member of the conspiracy commits a crime in furtherance of the conspiracy, the other members have also, under the law, committed that crime. Therefore, you may find a defendant guilty of possession of a firearm during and in relation to a drug trafficking crime, as charged in Count 1 or in Count 3 of the Indictment, if the government has proven each of the following elements beyond a reasonable doubt:

First, a person involved in the conspiracy in Count 1 or Count 3 knowingly possessed a firearm during and in relation to a drug trafficking crime;

Second, the person was a member of the conspiracy charged in Count 1 or Count 3;

Third, the person possessed the firearm in furtherance of the conspiracy;

Fourth, the defendant was a member of the same conspiracy at the time that the offense charged in either Count 1 or Count 3 was committed; and

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

231 F.3d at 1202–03.

necessary or natural consequence of the unlawful agreement." In light of this authority, we cannot say that the district court's formulation of the jury instruction was error that is plain, or that the instructions, read as a whole, were "misleading or inadequate to guide the jury's deliberation," *United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999).

In arguing otherwise, Gadson relies on *United States v. Castaneda*, 9 F.3d 761 (9th Cir. 1993), *overruled in nonrelevant part by United States v. Nordby*, 225 F.3d 1053, 1059 (9th Cir. 2000), which identified a due process limitation on the scope of *Pinkerton* liability in certain circumstances. *Id.* at 766. In *Castaneda*, the wife of a major drug trafficker was charged with a violation of § 924(c) under a *Pinkerton* theory. The only evidence linking the wife to the conspiracy was her marital relationship to her husband and a few phone calls in which the wife relayed information to members of the conspiracy at her husband's request. *Id.* at 767–68. We held that "due process constrains the application of *Pinkerton* where the relationship between the defendant and the substantive offense is slight," *id.* at 766, and concluded that a *Pinkerton* instruction would violate due process on the facts of that case, given the slight connection between the wife and the conspiracy, *id.* at 768. We emphasized, however, the narrowness of this holding. *Id.*

The due process concerns identified in *Castaneda* are not present here. There was substantial evidence of Gadson's participation in the drug conspiracy, and a reasonable jury could conclude that Gadson could have foreseen the use of firearms in connection with the drug trafficking. Accordingly, the application of a *Pinkerton* theory in this

context does not violate "fundamental precepts of due process." *Id.*

Gadson's reliance on *United States v. Green*, 592 F.3d 1057 (9th Cir. 2010), is likewise misplaced. *Green* analyzed the elements of vicarious liability for mail and wire fraud, and determined as a matter of first impression that the fraudulent acts committed by third parties in furtherance of the scheme must be reasonably foreseeable to the defendant for liability to attach. *Id.* at 1069–71. Based on this analysis, we struck down a jury instruction that required the government to prove only that "defendant or a co-schemer knew or could have reasonably foreseen" that a fraudulent communication would be emailed or faxed as part of the scheme. *Id.* Given that Gadson was not charged with the specific crime at issue in *Green*, it does not affect our plain error analysis.

B

Gadson also challenges the sufficiency of the evidence introduced at trial to support his conviction under *Pinkerton* for possession of two firearms in furtherance of drug trafficking pursuant to 18 U.S.C. § 924(c)(1).

To establish Gadson's liability under a *Pinkerton* theory, the government had to prove that it could be "reasonably foreseen as a necessary or natural consequence of the unlawful agreement" that one of Gadson's "coconspirators would use a firearm" in furtherance of the drug trafficking offenses. *United States v. Carter*, 560 F.3d 1107, 1113 (9th Cir. 2009) (internal quotation marks omitted). The government need not prove that Gadson had "actual knowledge that guns would be used," only that he was involved in the plan and such use would be reasonably

foreseeable "from the nature of the plan." *Id.* (internal quotation marks omitted).

Gadson does not challenge the jury's finding that one of the co-conspirators used a gun in furtherance of drug trafficking. Rather, he argues that the evidence was insufficient to prove that he could have reasonably foreseen that a co-conspirator at the Fouts house possessed the shotgun and handgun in furtherance of the drug conspiracy.

In reviewing the constitutional sufficiency of evidence to support a criminal conviction, we must determine whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Although Gadson moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure after the close of the government's case, he did not renew his motion after the close of all the evidence. Accordingly, we review his challenge for plain error, *see United States v. Phillips*, 704 F.3d 754, 762 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 2796 (2013), although we are mindful that plain error review of a sufficiency claim is only "theoretically more stringent than the standard for a preserved claim," *United States v. Flyer*, 633 F.3d 911, 917 (9th Cir. 2011) (internal quotation marks omitted).

Under this standard of review, the evidence was sufficient to sustain Gadson's conviction for possession of the two firearms in furtherance of the charged drug crimes. The evidence at trial showed that Gadson frequented the Fouts house, was a core member of the conspiracy, and was a primary supplier of cocaine sold out of the Fouts house. The

jury heard expert testimony that drug dealers commonly keep guns at locations with large quantities of drugs or money because they are concerned about raids by police or competitors, and the government introduced evidence regarding the drugs, cash, and firearms found at the Fouts house. There was also the more specific testimony at trial that Gadson was present when Joshua Haynes showed Voaklander an assault rifle hidden under the couch cushions and explained that it was to be used in case "somebody comes in through the front door." Taking this evidence in the light most favorable to the prosecution, *Jackson*, 443 U.S. at 319, a rational jury could have concluded that it was reasonably foreseeable to Gadson that one of his co-conspirators would use a firearm in furtherance of the drug trafficking offenses.

V

Wilson challenges the sufficiency of the evidence at trial as well. His claim is that the evidence introduced at trial was insufficient to support a finding that he assaulted Pitka in retaliation for providing information to a federal official in violation of 18 U.S.C. § 1513(b)(2).[14] Wilson did not move

---

[14] The statute provides:

> (b) Whoever knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for—
>
> (2) any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings given by a person to a law enforcement officer;

for acquittal at the close of trial, and so we review for plain error.

To prove a violation of § 1513(b)(2), the government must show: "(1) knowing engagement in conduct (2) either causing, or threatening to cause, bodily injury to another person (3) with the intent to retaliate for, *inter alia*," providing information relating to a federal offense to a law enforcement officer. *United States v. Henderson*, 626 F.3d 326, 342 (6th Cir. 2010) (internal quotation marks omitted). Wilson argues that no rational trier of fact could conclude that he acted with the requisite intent to retaliate against Pitka.

Wilson's argument fails. Taking the evidence in the light most favorable to the prosecution, the evidence showed that Wilson knew that Pitka was a confidential informant who had implicated Wilson and other coconspirators to the police. Further, a jury could have concluded that Wilson intended to harm Pitka because he was a "snitch." The evidence shows that Wilson assaulted Pitka in the hallway a few days after telling Gabriella Haynes that "[s]nitches can't go into the hallways," and later reported to Gabriella that he had hit "Donny," and made other statements suggesting he thought it was Pitka's involvement in the controlled buy that led to the unraveling of the drug conspiracy. Wilson offered no alternative explanation for the assault. Based on this evidence, a reasonable juror could conclude that Wilson intended to retaliate because Pitka provided information to

or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1513(b)(2).

the government. Accordingly, there was sufficient evidence to support Wilson's conviction under 18 U.S.C. § 1513(b)(2).

Because the evidence establishing that Wilson had the specific intent to retaliate against Pitka was derived primarily from his recorded telephone calls, Wilson also argues that the jury could not rely on this evidence because the calls constituted confessions that had not been adequately corroborated. *See United States v. Lopez-Alvarez*, 970 F.2d 583, 589–90 (9th Cir. 1992). We disagree. *Lopez-Alvarez* stated the longstanding rule that under most circumstances, a confession made to the police "requires some independent corroborating evidence in order to serve as the basis for a conviction." *Id.* at 589. We explained that the purpose of this rule is to address the "high incidence of false confessions and the resulting need to prevent errors in convictions based upon untrue confessions alone." *Id.* (internal quotation marks omitted). A secondary rationale is to preserve a robust criminal justice system premised on "extrinsic evidence independently secured through skillful investigation," rather than one that relies heavily on confessions. *Id.* at 589 n.5. Wilson's statements to his cousin are not confessions to the police, but private statements that were intercepted by the police. Therefore, the corroboration requirement of *Lopez-Alvarez* is not applicable. Moreover, the policy rationales underlying *Lopez-Alvarez* are not present when police investigation obtains statements or admissions made by the defendant to a third person under the circumstances here.

VI

We now address Gadson and Wilson's claims that the district court committed procedural errors at sentencing. In determining whether the district court erred in its calculation

of a defendant's sentence, we review the district court's interpretation of the Guidelines de novo, its application of the Guidelines to the facts for abuse of discretion, and its factual findings, including drug quantity and roles in an offense, for clear error. *United States v. Staten*, 466 F.3d 708, 713 (9th Cir. 2006); *see also United States v. Gonzalez*, 528 F.3d 1207, 1214 (9th Cir. 2008) (drug quantity); *United States v. Rivera*, 527 F.3d 891, 908 (9th Cir. 2008) (roles).

A

The Sentencing Guidelines set forth a procedure for determining the applicable sentencing range. The district court must first determine the correct offense guideline section applicable to the offense of conviction, and then determine the correct base offense level. *United States v. Rivera-Gomez*, 634 F.3d 507, 510–11 (9th Cir. 2011). Here the guideline for Gadson's convictions under 21 U.S.C. § 841(a)(1) for Counts 1 and 2 (conspiracy to distribute and possession of a controlled substance with intent to distribute) is § 2D1.1 of the Sentencing Guidelines. Section 2D1.1(a)(5) directs the district court to add up the drugs for which the defendant was responsible and then use the Guidelines' Drug Quantity Table to determine the defendant's base offense level. In determining the quantity of drugs for which a defendant is responsible, the district court is to consider all quantities of contraband with which the defendant was directly involved, and "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). After calculating the base offense level, the district court must determine the specific offense characteristics, *id.* § 2D1.1(b), determine any adjustments related to victim, role, and

obstruction of justice, *id.* § 1B1.1(a)(3), and determine the defendant's criminal history category, *id.* § 1B1.1(a)(6).

In making the required calculation of drug quantities, the district court adopted the Presentence Investigation Report's (PSR) findings that Gadson was responsible for 10,521,103 grams of marijuana equivalency, resulting in a base offense level of 36. *See* U.S.S.G. § 2D1.1(c)(2). The district court also adopted a two-level adjustment for "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance," *id.* § 2D1.1(b)(12), a three-level adjustment for being "a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive," *id.* § 3B1.1(b), and a two-level adjustment for obstruction of justice, *id.* § 3C1.1. Accordingly, the district court assigned Gadson a total offense level of 43, resulting in a Guideline sentencing range of life. U.S.S.G. Ch. 5, pt. A. The district court ultimately sentenced Gadson to 300 months of imprisonment and eight years of supervised release.

Gadson argues that the district court clearly erred in two ways in its calculation of the Guidelines range. First, he argues that the district court erred in calculating the quantity of drugs attributable to him. Second, he argues that there was insufficient evidence to support the three-level enhancement for having a managerial or supervisory role.

1

We start with Gadson's claim that the district court's calculation of the drug quantity attributable to Gadson was clearly erroneous. In cases involving "jointly undertaken

criminal activity," the base offense level is determined on the basis of "all reasonably foreseeable acts and omissions of others in furtherance" of that activity. U.S.S.G. § 1B1.3(a)(1)(B). The government bears the burden of proving the amount of drugs attributable to a defendant by a preponderance of the evidence. *United States v. Culps*, 300 F.3d 1069, 1076 (9th Cir. 2002). A district court may approximate the amount of drugs attributable to a defendant where the amount of drugs seized by the officers "does not reflect the scale of the offense." U.S.S.G. § 2D1.1 cmt. 5. In making an estimate, the court may consider, among other factors, "the price generally obtained for the controlled substance, financial or other records, [and] similar transactions in controlled substances by the defendant." *Id.* Thus, a court may convert cash into drug quantities, provided there is some evidence supporting a connection between the money seized and the drug transactions. *See United States v. Otis*, 127 F.3d 829, 836 (9th Cir. 1997) (citing *United States v. Gonzalez-Sanchez*, 953 F.2d 1184 (9th Cir. 1992)).

In this case, the PSR attributed to Gadson all the drugs seized from the Fouts house (1,977.4 grams of powder cocaine, 186 ecstasy pills, 31.5 grams of marijuana, 17.02 grams of crack cocaine, and 4.8 grams of heroin), all the drugs seized from the Gillam Way house (.4 grams of powder cocaine and 140.9 grams of marijuana), ten purchases of nine-ounce units of crack by Voaklander (2,551 grams), and another 4,623.7 grams of powder cocaine based on trial testimony. Using the conversion tables found at § 2D1.1(c) of the Sentencing Guidelines, the PSR converted the quantity of each drug into an equivalent quantity of marijuana, totalling 10,521,103 grams of marijuana. The PSR also converted the cash and money orders seized at the Fouts ($51,455) and Gillam Way ($43,020) houses into an

equivalent amount of powder cocaine, using a ratio of $40,000 per kilogram. The total amount of powder cocaine calculated in this manner was 2.27 kilograms. The district court expressly adopted the PSR's factual findings.

Gadson argues that the district court made three errors in calculating the drug quantity. First, he contends that the district court erred in failing to make an express factual finding that Gadson could reasonably foresee that all the drugs attributed to him (aside from the drugs seized from his Gillam Way house) were in furtherance of the jointly undertaken criminal activity. We disagree. While the "district court must make an express factual finding regarding the amount of drugs that the defendant reasonably foresaw as being part of the conspiracy," the district court "may satisfy the requirement that it make factual findings by specifically adopting the findings of the presentence report," *United States v. Whitecotton*, 142 F.3d 1194, 1198 (9th Cir. 1998), so long as the PSR includes more than "conclusory statements unsupported by the facts or the Guidelines," *United States v. Gamez-Orduño*, 235 F.3d 453, 464 (9th Cir. 2000) (internal quotation marks omitted); *see also United States v. Becerra*, 992 F.2d 960, 966 (9th Cir. 1993). Gadson's PSR contained detailed factual recitations connecting him to the drugs at issue and establishing that they were part of the conspiracy. Accordingly, the district court did not err in adopting the PSR findings as its own.

Second, Gadson claims that the district court erred by holding him accountable for 90 ounces (2,551.5 grams) of crack cocaine that Voaklander testified he had purchased from Joshua Haynes at the Fouts house over a nine-month period. These sales accounted for the lion's share of the drugs attributable to Gadson. The district court did not

clearly err in making this finding. First, Voaklander testified that Gadson had been present and observed approximately half of the transactions. Gadson claims that the district court erred in relying on Voaklander's allegedly uncorroborated and untrustworthy testimony. Nevertheless, because Voaklander testified under oath, and was subject to full cross-examination by Gadson's counsel, the district court could credit Voaklander's testimony even though it was uncorroborated and Voaklander would benefit from his cooperation with the government. *See United States v. Alvarez*, 358 F.3d 1194, 1213 (9th Cir. 2004). Moreover, other evidence introduced at trial established that Gadson was involved in the transactions at the Fouts house: he was regularly present at the house, his fingerprints were found on a box in the house containing nearly a kilo of cocaine, he received large sums of cash on two occasions from Joshua Haynes, who lived at the Fouts house and sold the drugs to Voaklander, and he complained about how the arrest of Transporter, who ferried drugs from Anchorage to Fairbanks, could have "messed everything up." In light of this testimony, the district court did not clearly err in finding that Voaklander's purchases of crack from Joshua Haynes were within the scope of the joint undertaking and reasonably foreseeable to Gadson.

Third, Gadson asserts that it was improper for the district court to convert the cash found in the Fouts and Gillam Way houses to marijuana and include the marijuana equivalency amount in calculating his base offense level. According to the PSR, the cash seized from the Fouts house was equivalent to 1.2 kilograms powder cocaine, and the cash seized from the Gillam Way houses was equivalent to 1.07 kilograms. Gadson argues that the government failed to prove that all of the seized currency (converted to 2.27 kilograms of powder

cocaine) was attributable to him. He also claims that the currency could have been associated with the sale of drugs that were already included in his base offense level, leading to double counting.

Gadson's argument is unavailing because any error in attributing the seized currency (converted to 2.27 kilograms of powder cocaine) to Gadson would be harmless. First, it is not clear that the 2.27 kilograms of powder cocaine were included in the calculation of Gadson's base offense level. In calculating the marijuana equivalency of the drugs attributable to Gadson, the PSR converted 6,601.5 grams of powder cocaine to 1,320,300 grams of marijuana. The 6,601.5 grams is equivalent to the amount of actual drugs seized from the Fouts (1,977.4 grams) and Gillam Way (.4 grams) houses, and the drugs described at trial (4,623.7 grams). Gadson does not explain how the 2.27 kilograms of powder cocaine were included in the calculation of his base offense level. But even if we assume that the PSR had converted the 2.27 kilograms of powder cocaine into 472,380 grams of marijuana equivalence (2,361.9 grams of power cocaine converted at a ratio of 1 : 200), and included that amount in the total amount of drugs attributable to Gadson, such inclusion would not affect his sentence. Removing the 472,380 grams would reduce the total quantity of drugs attributable to Gadson from 10,521,103 grams to 10,048,723 grams of marijuana equivalence. This is still 48,723 grams greater than the minimum quantity of drugs required to support the base offense level of 36 found by the district court. U.S.S.G. § 2D1.1(c)(2). Because the base offense level would be the same with or without the amounts attributable to the seized currency, any error was harmless. *United States v. Garcia-Guizar*, 234 F.3d 483, 491 (9th Cir. 2000).

2

We now turn to Gadson's claim that the district court erred in imposing a three-level sentencing enhancement for playing a managerial role. *See* U.S.S.G. § 3B1.1(b). Under § 3B1.1(b), an enhancement is required where a defendant was a "manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants." To prove that a defendant played such a role, the government must demonstrate that the defendant oversaw "one or more other participants," meaning persons who are "'criminally responsible for the commission of the offense, but [who] need not have been convicted.'" *United States v. Smith*, 719 F.3d 1120, 1125 (9th Cir. 2013) (quoting U.S.S.G. § 3B1.1 cmt. 2); *see also United States v. Woods*, 335 F.3d 993, 1001 (9th Cir. 2003).

In making this determination, a district court should consider "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *Rivera*, 527 F.3d at 908 (quoting U.S.S.G. § 3B1.1 cmt. 4). In particular, "there must be evidence that the defendant exercised some control over others involved in commission of the offense [or was] responsible for organizing others for the purpose of carrying out the crime." *United States v. Riley*, 335 F.3d 919, 929 (9th Cir. 2003) (alteration in original, internal quotation marks omitted). The district court need not make any specific findings as to this issue so long as evidence in the record supports an inference that the defendant exercised the

requisite degree of control. *United States v. Whitney*, 673 F.3d 965, 975 (9th Cir. 2012).

The district court did not clearly err in finding that Gadson played a managerial role in the drug conspiracy. The record supports an inference that Gadson "oversaw" a participant in the offense by the name of "Transporter." Transporter was not named in the indictment, but testimony at trial established that he transported drugs on several occasions from Anchorage, where Gadson maintained a residence, to the Fouts house, that his visits to Fairbanks were coordinated with Gadson's, and that Gadson complained that Transporter could have "messed everything up" if he were arrested. The district court could conclude, based on this testimony, that Transporter was a "participant" in the criminal offense, and that Gadson directed him to deliver drugs to Fairbanks from Anchorage. *Cf. United States v. Egge*, 223 F.3d 1128, 1132 (9th Cir. 2000) (finding § 3B1.1(b) enhancement warranted where participant, among other things, accompanied defendant on trips to pick up drugs); *United States v. Franco*, 136 F.3d 622, 631 (9th Cir. 1998) (finding § 3B1.1(b) enhancement warranted where defendant asked participant to run an errand for him and to set up a drug transaction). On those facts, imposition of the managerial role enhancement was not an abuse of discretion.

B

We next address Wilson's sentencing claim. The district court adopted the PSR's findings and assigned Wilson a base offense level of 28 based on the quantity of drugs attributable to him. Wilson claims that the district court erred in denying him a downward adjustment under U.S.S.G. § 3B1.2 because

he was "substantially less culpable" than the other participants. *See id.* cmt. 3.

A two-level downward adjustment for minor role is warranted when the defendant was "minor participant in any criminal activity." *Id.* § 3B1.2(b).[15]  The commentary explains that a "minor participant" must be a defendant who was "substantially less culpable than the average participant," *id.* § 3B1.2 cmt. 3(A), but "whose role could not be described as minimal," *id.* § 3B1.2 cmt. 5.  The defendant bears the burden of proving that he was a minor participant by a preponderance of the evidence. *United States v. Rosas*, 615 F.3d 1058, 1067 (9th Cir. 2010).

Here, the district court concluded that although Wilson was clearly not an organizer or leader of the operation, he was not a minor participant either, citing the fact that Wilson was one of the group, was trusted enough by Gadson and Haynes to be left alone at the house with the drugs and the guns, and was "aligned" with the co-conspirators as demonstrated by his assault on Pitka.  The testimony and evidence discussed extensively throughout this opinion support the district court's conclusion, which means the district court's determination that Wilson's level of involvement was not minor was not clear error. *See United States v. Daychild*, 357 F.3d 1082, 1102–03 (9th Cir. 2004) (no clear error where defendant was directly involved in a central act of the conspiracy, i.e., the exchange of drugs for money); *see also United States v. Del Toro-Barboza*, 673 F.3d 1136, 1155 (9th

---

[15] Wilson also maintains that he could be eligible for a 4-level "minimal" participant adjustment.  The analysis is similar for both categories, although a minimal participant must make a greater showing of his lesser complicity.  U.S.S.G. § 3B1.2.

Cir. 2012) (no clear error where defendant failed to provide any evidence explaining his lesser role in the conspiracy).

VII

Finally, defendants claim that the cumulative impact of the trial errors warrant reversal. Because we find no error—and certainly not prejudicial error—reversal is unwarranted.

**AFFIRMED.**

BERZON, Circuit Judge, concurring and dissenting:

I concur in the majority opinion except for Part III (B), concerning Officer Avery Thompson's testimony as to the content of the defendants' recorded telephone calls. As to Part III (B), the majority's holdings rest on *United States v. Freeman (Kevin Freeman)*, 498 F.3d 893 (9th Cir. 2007). *Kevin Freeman*, in my view, goes much too far in allowing lay officer testimony concerning recorded conversations. Other circuits are considerably stricter than *Kevin Freeman* in this regard. In my view, the other circuits are correct, and *Kevin Freeman* is wrong. *Kevin Freeman* should be revisited by an en banc court, perhaps in this case.

Even accepting *Kevin Freeman* as binding precedent for the present, I dissent. I would hold the trial court plainly erred under *Kevin Freeman* in admitting some of Officer Thompson's testimony, and that the error was prejudicial.

## I.

Defendants challenge Officer Thompson's testimony under Federal Rule of Evidence 701, which allows a lay witness to offer an opinion only if it is (a) "rationally based on the witness's perception," (b) "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and (c) "not based on scientific, technical, or other specialized knowledge within the scope of" expert testimony. Fed. R. Evid. 701. This Court broadly permits an officer to "interpret[] . . . ambiguous conversations based upon his direct knowledge of the investigation." *Kevin Freeman*, 498 F.3d at 904. That aspect of *Kevin Freeman* is, in my view, wrong, and it is, as the majority recognizes, inconsistent with the case law in several other circuits. *See, e.g.*, *United States v. Freeman (Marcus Freeman)*, 730 F.3d 590 (6th Cir. 2013); *United States v. Hampton*, 718 F.3d 978 (D.C. Cir. 2013); *United States v. Johnson*, 617 F.3d 286 (4th Cir. 2010); *United States v. Grinage*, 390 F.3d 746 (2d Cir. 2004); *United States v. Peoples*, 250 F.3d 630 (8th Cir. 2001); *see also* Maj. Op. at 30–31. The holding should be revisited by an en banc court.

## A.

*Kevin Freeman* addressed whether a police officer may testify as both an expert witness concerning coded drug terms and as a lay witness concerning his general knowledge about the case. The Court expressed concern "that a case agent who testifies as an expert receives 'unmerited credibility' for lay testimony," *Kevin Freeman*, 498 F.3d at 903 (citation omitted), but held that "the use of case agents as both expert and lay witnesses is not so inherently suspect that it should be categorically prohibited," *id.* at 904. In so holding, *Kevin*

*Freeman* also discussed the scope of permissible lay opinion testimony by an officer regarding the content of a defendant's recorded conversations. It is that portion of *Kevin Freeman* which the majority reaffirms, and on which it relies repeatedly in rejecting defendants' challenges to Officer Thompson's testimony.

In *Kevin Freeman*, the officer "offered interpretations of ambiguous conversations that did not consist of coded terms at all." 498 F.3d at 902. For example,

> [i]n several conversations, [the officer] interpreted ambiguous phrases such as "that," "they," and "one of them," to refer to either money or cocaine. In another conversation, [he] interpreted [a co-conspirator]'s statement, "Man, it's done already" to mean "he's given the cocaine to Kevin Freeman and that he's received his money for it."

*Id.* Similarly, "during one recorded telephone call, [a co-conspirator] stated that he 'touched bases with two of those.' [The officer] testified, without offering an explanation, that this meant that [the speaker] was able to obtain two kilograms of cocaine. *Id.* at 900. "During another recorded telephone call, Freeman informed [a co-conspirator] that he wished to get off of the telephone while driving. . . . [The officer] testified that Freeman's desire to get off of the telephone was motivated by a fear of being pulled over and arrested for the possession of cocaine." *Id.*

The Court noted that "in these instances [the officer] ceased to apply his specialized knowledge of drug jargon and the drug trade and began to interpret ambiguous statements

based on his general knowledge of the investigation." *Id.* at 902. *Kevin Freeman* nonetheless held that most of the officer's testimony met the requirements of Rule 701, because his "understanding of ambiguous phrases was based on . . . several hours of intercepted conversations . . . and other facts he learned during the investigation," and the testimony "proved helpful to the jury in determining what [the defendant and his co-conspirators] were communicating during the recorded telephone calls." *Id.* at 904–05. In the Court's view, the officer's testimony "did nothing more than offer one possible framework for understanding the conversation." *Id.* at 902. The Court did not express any concern about whether the information that formed the basis of the officer's testimony came from evidence that had not been presented to the jury.

## B.

Other circuits have severely restricted the ability of officers to testify on the basis of information not before the jury. In *Marcus Freeman*, the Sixth Circuit held that an FBI agent's testimony regarding the meaning of the defendant's recorded conversations was improper lay opinion testimony under Rule 701. 730 F.3d at 596–99. The court noted that "there is a risk when an agent 'provides interpretations of recorded conversations based on his knowledge of the entire investigation . . . that he [is] testifying based upon information not before the jury, including hearsay, or at the least, that the jury [c]ould think he ha[s] knowledge beyond what [is] before them.'" *Id.* at 596 (citing First, Second, and D.C. Circuit opinions).

The agent in *Marcus Freeman* "repeatedly substantiated his responses and inferences with generic information and

references to the investigation as a whole." *Id.* But he "failed to explain the basis of his interpretations—what experience he had that the jurors themselves did not have—and therefore failed to lay a foundation under Rule 701." *Id.* at 597. Although the agent testified that he had listened to approximately 23,000 recorded calls, the jury only heard a small number at trial. *Id.* at 597–99. The court was concerned that the jury, "left in the dark regarding the source of [the agent's] information," *id.* at 596, and with "no way of verifying his inferences or of independently assessing the logical steps he had taken," *id.* at 597, "likely gave him the benefit of the doubt in this situation," *id.* at 596. *Marcus Freeman* held such rootless testimony to be an impermissible usurpation of the jury's function. *Id.*[1]

The D.C. Circuit reached a similar conclusion in *Hampton*, holding that an FBI agent improperly testified about his understanding of a defendant's recorded conversations, where the jury had no way to "verify[] his inferences or . . . independently reach[] its own interpretations." 718 F.3d at 982–83. In that case, the government acknowledged during its opening statement that "the recorded telephone calls were 'very, very cryptic,'" and that the jury would need help from the agent "to interpret them." *Id.* at 981. The agent then testified that he had "reviewed every conversation—some 20,000—captured by the wiretaps, not just the 100 or so recordings admitted into evidence," and as a result he had a better understanding of what was being said than did the jury. *Id.* The court noted

---

[1] As these quotes show, and contrary to the majority's account, *see* Maj. Op. at 33–34, *Marcus Freeman*'s primary concern was that the jury was not provided information as to the source of the officer's knowledge of the investigation, not that he did not have the requisite knowledge.

that under Rule 701, the "[j]urors too must independently assess the basis of the opinion and scrutinize the witness's reasoning. But '[w]hen a witness has not identified the objective bases for his opinion, the proffered opinion . . . does not help the jury but only tells it in conclusory fashion what it should find.'" *Id.* (quoting *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992)).

In *Grinage*, the Second Circuit was likewise troubled by "the risk that [the case agent] was testifying based upon information not before the jury." 390 F.3d at 750. As in *Hampton* and *Marcus Freeman*, the agent testified that he had listened to many more recorded conversations than would be played for the jury, and "some pertinent calls he listened to 'upwards of 20 plus times.'" *Id.* at 748. He also repeatedly "told the jury that his interpretations were 'based on [his] knowledge of the entire investigation.'" *Id.* at 748–49. In doing so, the court concluded, he "interpreted both the calls that the jury heard and the calls that the jury did not hear." *Id.* at 750. Moreover, "the agent was presented to the jury with an aura of expertise and authority which increased the risk that the jury would be swayed by his testimony, rather than rely on its own interpretation of the calls." *Id.* at 751. Accordingly, "his interpretations of the calls went beyond permissible lay opinion testimony under Rule 701(b) because, rather than being helpful to the jury, it usurped the jury's function." *Id.*

These cases well identify the dangers of allowing a police officer — who is not an ordinary lay person — to testify based on masses of information not described in any detail to the jury. When our circuit held in *Kevin Freeman* that an agent's "interpret[ation of] ambiguous statements based on his general knowledge of the investigation" was permissible

lay opinion testimony, it did not address these risks at all. 498 F.3d at 902.

The majority now reads *Kevin Freeman* as providing blanket approval for Officer Thompson's lay opinion testimony, even though he failed to explain the basis for his opinions and often invoked, without any detail as to the source, his knowledge of evidence not presented at trial. That understanding — which may well be an accurate reading of *Kevin Freeman* — confirms that our case law has sanctioned a major breakdown in the limits properly placed on lay opinion testimony. The majority maintains otherwise, rejecting the holdings in cases such as *Hampton*, *Grinage*, and *Marcus Freeman* as inconsistent with Rule 701's acceptance of lay opinion testimony. Not so.

For one thing, although the majority opinion professes confidence in the jury's ability to "identify unreliable [lay] opinion testimony," Maj. Op. at 31, enabling case agents to opine on the basis of information not before the jury, without sharing that information, the majority deprives the jury of the information it would need to perform that critical function. How can the jury be expected to evaluate the reliability of lay opinion testimony when the "experience [the agent] ha[s] that the jurors themselves d[o] not have" is not identified for the jury? *Marcus Freeman*, 730 F.3d at 597. Of equal importance: when a case agent is not required to provide the factual basis for his testimony, the district court has no way of assessing whether he is "rely[ing] upon [or] convey[ing] inadmissible hearsay evidence" or other improper bases for lay opinion testimony. *Kevin Freeman*, 498 F.3d at 904. The majority's holding thus undermines both the foundational gatekeeping role played by judge and the factfinding role of jury. Rule 701 does not contemplate such abdication.

Nor, contrary to the majority's supposition, is what the majority permits here, relying on *Kevin Freeman*, in any way similar to a lay witness identifying a photograph based on past contacts with the individual, contacts outside the jury's knowledge. *See* Maj. Op. at 31. There are four reasons at least why this analogy does not work, and why the testimony in this case went far beyond the intended confines of the lay opinion rule, Rule 701.

First, we actually have no idea, nor did the jury or judge, whether Officer Thompson's testimony was "rationally based on [his] perception[s,]" Fed. R. Evid. 701(a), or instead on what he heard from others — via reports, conversations, and so on — during the course of the investigation.

Second, Officer Thompson was not testifying to something of which he had knowledge that the jury did not. The jury itself heard the tapes, as well as information about the events constituting the crimes. Officer Thompson was instead telling the jury the meaning he ascribed to particular facts and conversations, rather than leaving that determination to the jury.

Third, a police officer is not an ordinary lay witness. He is associated directly with the prosecution, and is likely to be regarded as enjoying special authority or expertise, even if not testifying as an expert witness. His interpretation, when premised, as here, on asserted vast knowledge beyond the jury's ken, is likely to be accorded more weight than that of the usual percipient witness whose ability to provide coherent testimony Rule 701 was meant to preserve.

Finally, Officer Thompson's statements regarding the technologically improved means by which he listened to the

tapes, *see infra* pp. 70–73, indicates that his testimony does not meet the third requirement of Rule 701 — that it "not [be] based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c); *see also United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002) (identifying, as a requirement of Rule 702, that "the subject matter at issue must be beyond the common knowledge of the average layman"). Perception using specialized equipment is not the sort of lay opinion at which Rule 701 is directed. A professional photographer who was able to identify an individual in a photograph only after amplifying the details through the use of specialized equipment would not be giving lay opinion testimony, even though he was in the end reporting his own (amplified) perceptions.

## C.

This case illustrates the pitfalls of a regime in which officers are permitted to testify as lay witnesses on the basis of information derived from the investigation as a whole, not all of which is before the jury, using specialized equipment and methodologies not available to the jury.[2]

All parties acknowledge the recordings were of poor quality. Officer Thompson began his testimony by "let[ting]

---

[2] It is important to note that unlike in prior cases challenging an officer's interpretation of recorded conversations, the parties here have not provided this Court with any recording or transcript of the telephone calls at issue. The Court has only a transcript with the notation "(Audio played)" followed by Officer Thompson's testimony interpreting that audio. The majority thus relies entirely on Officer Thompson's *own* testimony in holding that the recorded statements were "vague" and that Officer Thompson's opinions "would provide helpful context" for jury. Maj. Op. at 35.

the jury know" that "sometimes the jail phone calls are kind of hard to . . . hear" and "sometimes it might be a little bit hard to understand." "[S]ometimes they're just fuzzy," and "the volume's not so good on them." The prosecution asked whether Officer Thompson could "direct us to what [he] w[as] hearing" "[i]f it's not a real clear – when we try to play it over the system." And throughout the trial, because the statements were not always "clear on the recording" the prosecution often asked Officer Thompson what particular participants were "saying here?"

Officer Thompson also repeatedly vouched for his understanding of the recordings because he had "a better way of listening to" them than the jury. Specifically, Officer Thompson told the jury that prior to the trial he listened to the recordings "a lot of the times, . . . pushing the headphones into my ears, and slowing some of the phone calls down." In addition to having been able to "control . . . the phone calls" by "play[ing] it back three seconds and listen[ing] to it again," Officer Thompson was also able to "sit down [in] a super- — super-quiet room" when listening to the recordings. As a result, Officer Thompson "was confident [he] was hearing it correctly" and "in [his] notes," which he referenced repeatedly during trial, he "tried as best as possible to write down accurate statements." Officer Thompson thus affirmed his ability to "translate" the calls if the jury was unable to hear them clearly.

In light of the poor quality of the recordings, Officer Thompson's expressed confidence in his own "translat[ion]" imbued him "with an aura of expertise and authority which increased the risk that the jury would be swayed by his testimony." *Grinage*, 390 F.3d at 751. Although the court instructed the jury that the "[s]tatements made on the phone

calls are the evidence, not the discussion that counsel and witnesses have had," the instruction was an ineffective cure when the jury was repeatedly reminded that it had a more limited ability to hear and understand the phone calls than did the witness. *Cf. United States v. Robinson*, 707 F.2d 872, 879 (6th Cir. 1983) (holding that it was error to admit tapes portions of which were entirely inaudible because it caused the jury to rely too heavily on unreliable transcriptions of the recorded conversations).

The risk that the jury would improperly defer to Officer Thompson's judgment was compounded by his repeated testimony that he listened to hundreds of hours of recordings to which the jury was not privy. He told the jury "just so everyone knows, there's about 150 hours or so of jail phone call recordings." Of those, he "probably listened to a total of 110, 120 of these . . . tapes" and "tr[ied] to maintain notes of a lot of them." The jury was then told that it would "[c]ertainly not" have to "listen to all . . . 150 hours." It would only be hearing a "[l]imited number of calls." Throughout the trial, Officer Thompson was asked to provide his interpretation of the calls on the basis of the "investigation" as a whole, and he frequently invoked his knowledge of "all of the conversations[.]"

Thus, when the quality of a recording was poor, Officer Thompson told the jury that he could rely on his extensive knowledge of other recordings to ensure that he was translating the call properly. For example, when the prosecution noted that it "was having trouble hearing" a particular recording, and asked Officer Thompson to "clarify what we were hearing there[,]" Officer Thompson stated "I've listened to literally probably in excess of 100 hours of

conversation, so I've got a pretty good grasp on being able to listen to this[,]" before telling the jury what was being said.

Officer Thompson also directly testified about portions of the recordings that were not, in fact, played for the jury. For example, he testified that there is "a very short clip out of the same phone call," in which Defendant Willie L. Wilson "says, 'Yeah, they got my ring from the house.'" When the prosecutor attempted to correct Officer Thompson, suggesting that the clip may have said only "'They got my ring[,]'" Officer Thompson responded "I think the clip actually was cut a little short." He also testified regarding a portion of a conversation in which Wilson states that he is going to "exit[] the line for just a moment" to go and get his "paperwork," including a police report. But the prosecutor decided "to move ahead to where Mr. Wilson is returning with the paperwork, rather than necessarily listening to him going and getting the paperwork." Although the prosecutor's decision to skip ahead is understandable to avoid having to listen to minutes of silence, the jury was asked to trust Officer Thompson that prior to placing the call on hold, Wilson stated that he was going to go get his legal paperwork.

As in *Marcus Freeman*, Officer Thompson "drew conclusions from the phone calls the jury heard as well as from . . . other phone calls and . . . evidence the jury had no access to. In doing so, he infringed upon the role of the jury to decide what to infer from the evidence, and instead told them what conclusions and inferences to draw." 730 F.3d at 598. In light of Officer Thompson's repeated invocation of recordings not in evidence "the jury was left to trust that he had some information—information unknown to them—that made him better situated to interpret the words used in the calls than they were." *Id*. at 597.

Notably, when questioned on cross-examination whether a particular phrase frequently used by Wilson "could be interpreted [in] any number of different ways," Officer Thompson stated "I think out of context, it certainly could be. I think if you placed it in context with the prior statements and the statements made after that," not all of which the jury had access to, "I think it certainly puts it into a better perspective." This testimony was similar to that found troubling in *Hampton*, where an agent was asked if it was possible for someone else — the jury, perhaps — to understand a statement differently, and he responded "'[i]f they just had this portion of the conversation and didn't know other things about the investigation and other conversations, maybe. But I think—anybody who has listened to all of the calls and is aware of all of the conversations would agree with me.'" 718 F.3d at 982. As in *Hampton*, Officer Thompson's suggestion that no other interpretation of the telephone calls would be correct when placed in context — context unavailable to the jury — created a serious "risk that the jury w[ould] defer to the officer's superior knowledge of the case" and the recordings themselves. *Id.* at 981.

The recordings' poor quality, as well as the limited selection played, left the jury without "the information it need[ed] to conduct an independent assessment of lay opinion testimony." *Id*. Aside from vague references to "the investigation" as a whole, Officer Thompson "failed to explain the basis of his interpretations—what experience he had that the jurors themselves did not have—and therefore failed to lay a foundation under Rule 701." *Marcus Freeman*, 730 F.3d at 597. In *Grinage*, all 2,000 recorded calls were admitted into evidence, even though only thirteen were played at trial. 390 F.3d at 747–48. When the officer in *Grinage* gave his opinion based on having "listened to all of"

the calls, *id.* at 748, the jury was at least able to listen to the recordings that informed the officer's testimony, if it so desired. Here, by contrast, none of the calls — not even the ones played during trial — were directly admitted into evidence.[3] Thus when Officer Thompson "interpreted those conversations on the basis of his listening to 'all of the calls,' the jury had no way of verifying his inferences or of independently assessing the logical steps he had taken." *Marcus Freeman*, 730 F.3d at 597 (quoting *Hampton*, 718 F.3d at 983). It is understandable that "the jury, left in the dark regarding the source of [Officer Thompson]'s information, [would] likely g[i]ve him the benefit of the doubt in this situation." *Id.* at 596. But to allow the jury to so do is to sanction an abdication of the jury's duty.

---

[3] It appears that the government failed to preserve excerpts of the recordings containing only those telephone calls, or portions thereof, that were actually played at trial. When the jury asked during deliberations to "review the recordings of all jail phone calls," the court played only the audio recording of the trial proceedings in which the telephone calls were played — essentially, a recording of a recording. The next morning, the jury asked if it could hear "the original telephone recordings, not the recordings of the playback?" — presumably because the trial recordings were even harder to hear than the original tapes. But because the government had failed to preserve the excerpts, and defense counsel expressed concern that if allowed access to the full recordings, the jury might inadvertently hear portions that were never played at the trial, the court agreed to tell the jury that "the originals were not submitted into evidence, can't be provided at this time."

Although I agree with defendants' appellate argument that it would have been prudent for the district court to require the government to isolate the portions of the telephone calls played at trial and admit them into evidence, defendants forfeited any argument in this regard by consenting to the district court's chosen solution.

*Kevin Freeman* allows the jury's critical factfinding role to be usurped by law enforcement testimony based on evidence not presented at trial. As other circuits have held, this procedure has no basis in the Federal Rules of Evidence, undermines trial by jury, and cannot be allowed.[4]

## II.

Even under *Kevin Freeman*, the admission of some of Officer Thompson's testimony was in error.

The bulk of Officer Thompson's testimony appears to have involved interpretation of "not only code words but also common words used in common ways." *Marcus Freeman*, 730 F.3d at 598. *Kevin Freeman* held that an officer's interpretation of statements "that were not encoded drug jargon, but instead were phrases that were more likely to be understood by the jurors without assistance" violates Rule 701. 498 F.3d at 900.

For example, *Kevin Freeman* held "not helpful to the jury," *id.* at 905, the officer's interpretation of one

---

[4] The majority opinion references six other circuits, which it says "allow officers to provide interpretations of recorded conversations based on their knowledge of the investigation, subject to various safeguards." *See* Maj. Op. at 27 n.5. A careful review of the cases cited makes clear that they do not condone what happened here. *See, e.g.*, *United States v. Albertelli*, 687 F.3d 439, 444–48 (1st Cir.2012) (approving officer's testimony where it did *not* "rely on broad appeals to 'the totality of the investigation' but instead usually pointed to sources of information"); *United States v. Jayyousi*, 657 F.3d 1085, 1102–03 (11th Cir. 2011) (approving police officer's testimony regarding the meaning of code words used in recorded telephone calls); *United States v. Rollins*, 544 F.3d 820, 830–33 (7th Cir. 2008) (same).

defendant's "instruct[ion] [to another] to speak with him later so that they 'can get all the particulars,'" as being "a reference to the 'details,'" *id.* at 900. Similarly, when one defendant asked another "how everything had turned out," we held unhelpful the officer's testimony that the defendant "was asking . . . how did the 'drug deal turn out, how did everything go?'" *Id.* This testimony was particularly troubling because it involved the case agent's speculation as to whether the defendant was involved in a drug conspiracy, the precise issue the jury was required to decide. We noted in *Kevin Freeman* that the case agent's "specialized knowledge of the particular language of drug traffickers did not give him carte blanche to testify as to the meaning of other words in recorded telephone calls without regard to reliability or relevance." *Id.* at 904.

In this case, Officer Thompson translated phrases that were similarly "likely to be understood by the jurors without assistance." *Id*. at 900. For example, much of Officer Thompson's testimony appears to have involved simply repeating the words said on the recorded telephone calls, in case the jury "couldn't hear it." Other testimony consisted of Officer Thompson's speculation as to the meaning of statements made up of clear terms. For example, during one of the calls, Wilson said something to the effect of "whoever, the CI [(confidential informant)] is, it's close." When asked what Wilson meant by that, Officer Thompson stated he meant "close to them" physically, as opposed to "close to reality or close to actuality." This testimony amounts to pure speculation on the part of Officer Thompson as to what Wilson meant when he said the CI was "close." Although Officer Thompson's interpretation was a reasonable one, it was unhelpful to the jury, which had the same ability — and the responsibility — to interpret such ordinary language.

Similarly, in a recorded call the day after the altercation with Donny Pitka, Wilson is described as having said, "'You know, he's the one that started this shit.' . . . 'That time with Batman, that was him.'" Officer Thompson then explained to the jury that "Batman" is a nickname for alleged co-conspirator, Brandon Haynes. This testimony, which was derived directly from his knowledge of the investigation and was not within the jury's own powers of reason, would be permissible under *Kevin Freeman*. 498 F.3d at 901–02 (approving testimony regarding coded drug jargon). Officer Thompson went on, however, to explain, "[i]t appears that [Wilson]'s referring back to the November incident, where Mr. Pitka was in fact . . . the one who was setting up the purchase from Mr. Brandon Haynes." This statement usurped the jury's function, even under *Kevin Freeman*'s limited acknowledgment of that function. Once informed that Batman was, in fact, Brandon Haynes, the jury was more than capable of interpreting Wilson's statement without the assistance of Officer Thompson.

As Officer Thompson's testimony consisted largely of "either speculation or repetition of already clear statements," its admission violated Rule 701 as interpreted by this court. *Kevin Freeman*, 498 F.3d at 905.

## III.

Although the district court's error was plain, relief is not warranted unless the error "affected substantial rights" and "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vences*, 169 F.3d 611, 613 (9th Cir. 1999) (internal quotation marks and citation omitted). The requirement that an error "'affect[] substantial rights' . . . in most cases . . . means that the error

must have been prejudicial: It must have affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993). On plain error review, the defendant "bears the burden of persuasion with respect to prejudice." *Id.*

Wilson has met that burden only with respect to his conviction on Count 7 for retaliation against a witness in violation of 18 U.S.C. § 1513(b)(2). I therefore dissent only with respect to Count 7.

Section 1513(b)(2) punishes "[w]hoever knowingly engages in any conduct and thereby causes bodily injury to another person . . . with intent to retaliate against any person for . . . information relating to the commission . . . of a Federal offense . . . given by a person to a law enforcement officer. . . ." To convert a simple assault into a § 1513(b)(2) violation, therefore, the offense must have been committed with the specific intent to retaliate against a witness for providing information to law enforcement. *See United States v. Maggitt*, 784 F.2d 590, 593–94 (5th Cir. 1986).

Officer Thompson's "translat[ion]" of and testimony regarding the recorded phone calls contained the only direct evidence of Wilson's intent to retaliate against Pitka for providing information to law enforcement. Officer Thompson testified regarding a call between Wilson and his cousin, Gabriella Haynes, the day after the incident with Pitka. Officer Thompson testified that Wilson admitted to having hit "'Donny'" because "'he's the one that started this shit.'" Officer Thompson testified about another call in which "Wilson [is] talking about how they put Mr. Pitka's name . . . in the paper[,]" meaning "the documents that went to the jail." Officer Thompson also told the jury that Wilson

stated in a call the morning of the assault that "[s]nitches can't go into the hallways." Added to Officer's Thompson's testimony about the informant being "close" and the reference to the "November incident," his speculation and professed "translat[ion]" of these "already clear statements[,]" *Kevin Freeman*, 498 F.3d at 905, provided a direct link between the assault and Wilson's intent to retaliate against Pitka for being a "[s]nitch[.]"

Aside from Officer Thompson's testimony, the evidence of Wilson's intent was minimal. Wilson was not present in the gym when Defendant Anthony Gadson and alleged co-conspirator Donte Edwards confronted Pitka about being a "snitch." Edwards, who testified for the prosecution, never said that he shared with Wilson his suspicions that Pitka had been a confidential informant. Pitka himself testified that Wilson said nothing to him before, during, or after the alleged assault, and that Pitka did not know why he was attacked. Although Pitka testified that he later believed it was because the government "sen[t] paperwork in on me," he provided no basis for his speculative conclusion. Without Officer Thompson's prejudicial testimony, there is a "reasonable probability that the jury would not have convicted" Wilson on Count 7. *United States v. Teague*, 722 F.3d 1187, 1192–93 (9th Cir. 2013).

Finally, there is no question that Officer Thompson's testimony "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Vences*, 169 F.3d at 613 (internal quotation marks omitted). In "offer[ing] a narrative gloss . . . consist[ing] almost entirely of [his] personal opinions of what the conversations meant[,]" *Peoples*, 250 F.3d at 640, Officer Thompson's unhelpful testimony "usurped the function of the jury to decide what to

infer from the content of the calls," *Grinage*, 390 F.3d at 750. Nothing could be more central to the integrity of judicial proceedings than the right to have the jury — not the police or the prosecution — decide a defendant's guilt or innocence. For these reasons, I dissent from Part III (B) of the majority opinion.